

RECEIVED AXK
11/10/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

United States of America ex rel.

TIMOTHY PETERSON
_____
(Full name and prison number)
(Include name under which convicted)

PETITIONER

    vs.

ILLINOIS
_____
(Warden, Superintendent, or authorized
person having custody of petitioner)

RESPONDENT, and

**(Fill in the following blank only if judgment
attacked imposes a sentence to commence
in the future)**

ATTORNEY GENERAL OF THE STATE OF

_____
(State where judgment entered)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

1:25-cv-13762
Judge Edmond E. Chang
Magistrate Judge M. David Weisman
PC 10
RANDOM / Cat. 3

CASE NO: _____
(Supplied by Clerk of this Court)

Case Number of State Court Conviction:

2011-CF-69
_____

## PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: IN THE CIRCUIT COURT OF LASALLE COUNTY, ILLINOIS, 13th JUDICAL CIRCUIT

2. Date of judgment of conviction: July 8, 2011

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
II. Predatory Criminal Sexual Assault of a Child. III. Predatory Criminal Sexual Assault of a Child. IV. Predatory Criminal Sexual Assault of a Child.

4. Sentence(s) imposed: ~~7 Years Each, Consecutive (21 years total) plus 3 Natual Life~~ MSR

5. What was your plea? (Check one)    (A) Not guilty    ( )
                                    (B) Guilty          ( X )
                                    (C) Nolo contendere    ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

Count I dropped, while counts II, III, and IV were plead guilty.

**PART I -- TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one):    Jury ( )         Judge only ( )       Plea (X)

2. Did you testify at trial?   YES ( )        NO     ( X )

3. Did you appeal from the conviction or the sentence imposed? YES ( X )  NO ( )

    (A)  If you appealed, give the

        (1)  Name of court:  <u>Third District Appellate Court</u>

        (2)  Result:        <u>Remand, Rule 606</u>

        (3)  Date of ruling:  <u>12/06/2012</u>

        (4)  Issues raised:  <u>Violation of One Act One Crime (King Doctrine) and In-</u>
<u>effective Assistance of Counsel</u>

    (B)  If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES ( )     NO (X)

    (A)  If yes, give the

        (1)  Result  <u>Removed appeal after Remand out of fear of harsher sentence</u>

        (2)  Date of ruling:  <u>N/A</u>

        (3)  Issues raised:

    (B)  If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )  No (X)

    If yes, give (A) date of petition:        (B) date *certiorari* was denied:

**PART II – COLLATERAL PROCEEDINGS**

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (X)   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.  Name of court: IN THE CIRCUIT COURT OF LASALLE COUNTY, ILLINOIS, 13th JUDICAL CIRCUIT

    B.  Date of filing:  Feb. or Mar. 2022

    C.  Issues raised: Rule 606, Miranda Rights violation, Due Process rights violation,

        Ineffective Assistance of Counsel/Conflict of Interest, Double Jeopardy,

        Excessive Bail, Cumulative Error, Discovery & Disclosure, Evidentary Hearing,...

    D.  Did you receive an evidentiary hearing on your petition?    YES ( )  NO (X)

    E.  What was the court's ruling? Endless continuance, requested change of counsel(denied), Said I had to go "Pro Se", pulled petition due to high "RISK" without counsel.

    F.  Date of court's ruling:    Jan. or Feb. or 2023

    G.  Did you appeal from the ruling on your petition?    YES ( )  NO (X)

    H.  (a) If yes,    (1) what was the result?

                  (2) date of decision:

        (b) If no, explain briefly why not: petition was pulled/withdrawn

    I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

       YES ( ) NO (X)

       (a) If yes,   (1) what was the result?

                 (2) date of decision:

       (b) If no, explain briefly why not:

2.  With respect to this conviction or sentence, have you filed a petition in a state court using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?   YES ( )     NO ( X )

    A.  If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.  Nature of proceeding     N/A

        2.  Date petition filed     N/A

        3.  Ruling on the petition     N/A

        3.  Date of ruling     N/A

        4.  If you appealed, what was the ruling on appeal?     N/A

        5.  Date of ruling on appeal     N/A

        6.  If there was a further appeal, what was the ruling ?     N/A

        7.  Date of ruling on appeal     N/A

3.  With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?   YES ( )    NO ( X )

    A.  If yes, give name of court, case title and case number:     N/A

    B.  Did the court rule on your petition?  If so, state

        (1)  Ruling:     N/A

        (2)  Date:     N/A

**4.  WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?**

YES ( )   NO ( X )

If yes, explain:     N/A

## PART III — PETITIONER'S CLAIMS

1. State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one  Double Jeopardy/Multiplicity of Charges Violations
Supporting facts (tell your story <u>briefly</u> without citing cases or law):

Prima Facie on JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS order,

All 3 charges same, same date of offense, same victim (oldest daughter), same

course of conduct. (Due to charge being against a family member, it can be

argued charge is incorrect anyway.) Each charge carries a consecutive sentence

of 7 years, plus MSR in addition to sentence which is indeterminate, thus

unconstitutional.


(B) Ground two  Ineffective Assistance of Counsel/Counsel in Conflict of Interest
Supporting facts:

Counsel never had hearing on Miaranda Right's Violation he filed. Never challenged

evidence (Franks Hearing) or sought possible Brady violations. Thus robbing me

of Due Process. Since wife hired him, he felt fiduciary responsibilty to wife

and was looking out for the victim's best interests, rather than mine, which creates

a conflict of interest. And may be motivation for lack of evidentiary challenges.

5

(C) Ground three  Miranda Rights Violations
Supporting facts:

While police officers at the Earlville Police Station held me and my three sons

there for much of the day, they repeatedly asked me to make a statement at which

I asked to speak to a lawyer.  A request which was ignored, and they kept asking

me to make a statement.  At no time did I feel that I was free to go.  Attorney

Phillip Nathe (Naperville) filed a Motion concerning this violation but it was

never heard.

(D) Ground four  5th, 6th, and 14th Amendment, Due Process Violations
Supporting facts:

I'm entitled to evidentuary hearings (Franks hearings), and the chance to

legally challenge evidence.  A practice common even for plea agreements to

challenge as much evidence as possible to weaken prosecution's case as a stategy

to get a better plea agreement.  Plus we were dealing with a known Miranda Rights

violations which was never heard.  Even in Post Conviction Petition, Public Defender

refused to lift finger and kept doing "continuances", when asked for change of

counsel, the judge refused and said I had to go Pro Se which I equipped for.

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
    YES ( )   NO ( X)

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:
When judge said I had to go pro se or keep using counsel who did endless "continuances",
I knew they were not going to let my case go anywhere eventhough I had grounds and
let me go to phase 2.  So I pulled my Post Conviction Petition due to pressure.

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing  Timothy Capillini (Public Defender's Office) 707 Etna Rd., Ottawa

(B) At arraignment and plea  Philip R. Nathe, 552 S. Washington, St 104, Naperville, IL 60450

(C) At trial N/A, Guilty Plea

(D) At sentencing  Philip R. Nathe

(E) On appeal  Peter Anthony Carusona (Lead)

(F) In any post-conviction proceeding (Public Defender's Office)

(G) Other (state): N/A

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( x )

Name and location of the court which imposed the sentence: N/A

Date and length of sentence to be served in the future  N/A

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on:   11 / 3 / 25
             (Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_____
(Signature of petitioner)
M22384
(I.D. Number)
1144 IL RT 29, Taylorville, IL 62568
(Address)

REVISED 01/01/2001

**Pending Initiation Steps**

**STEP 6: Add Filing Fee**

### Case Information: 3-11-0632

| | | | |
|---|---|---|---|
| **Court:** | Appellate Court - 3rd District | **Filed:** | 09/06/2011 |
| **Classification:** | Appeal - Notice of Appeal - Criminal | **Case Status:** | Closed |
| **Short Title:** | People v. Peterson, Timothy | **Rule:** | 606 |
| **Full Title:** | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY PETERSON, Defendant-Appellant. | **Trial Court Case Number:** | 11CF69 |
| **County/Agency:** | LaSalle County Circuit Court | **Related Case(s):** | |
| **District:** | 3rd | **Associated Case(s):** | |
| **Circuit:** | 13th | **Consolidated Case(s):** | |
| **Recusal:** | | **Track:** | |

📄 Case Notes        Edit Case

### - Party Information    Party Details

| Role | Party Name | Dist. List | Representation | Dist. List |
|---|---|---|---|---|
| Appellant | Timothy Peterson | | Peter Anthony Carusona (Lead) | Y |
| Appellee | People | | Terry A. Mertel (Lead) | Y |
| | | | Brian James Towne | Y |
| **Participant** | | | | |
| Court Reporter | Michelle Jansz | | | |
| Court Reporter | Launius Reporting Service, Inc | | | |
| Court Reporter | Sara Moore | | | |
| Court Reporter | Emily Nixon | | | |
| Court Reporter | Kala Ryan | | | |
| Court Reporter | Julie Schwarzbach | | | |

### Docket Entries

**Display:** Threaded ▾     **Docket Entry Type Filter:** All ▾

**Docket Information**

| Document Description | Filing Date | Docket Entry Type | Docket Entry Subtype | PDF |
|---|---|---|---|---|
| • Mandate * - Mandate Issued | 12/06/2012 | Mandate * | Mandate Issued | |
| ◦ Disposition * - Order Filed | 12/02/2011 | Disposition * | Order Filed | |
| • 1 - Motion -Remand | 11/10/2011 | Motion | Motion | |
|    • Order - Allowed | 12/02/2011 | Order - Responding Order | Other | |
| • Record - Other Record | 11/01/2011 | Record | Other Record | |
| • Record - Record on Appeal Filed | 11/01/2011 | Record | Record on Appeal Filed | |
| • Schedule Order - Schedule Order Entered | 09/14/2011 | Schedule Order | Schedule Order Entered | |
| • Docketing Statement - Docketing Statement Filed | 09/13/2011 | Docketing Statement | Docketing Statement Filed | |

Hold: CJCCSV20    Job: 063470 User: QTMHUTYP    Program: RPT800NG

Date: 10/27/25 Time: 8:03:03 Page: 1

C L E R I C U S   M A G N U S

HON. GREG VACCARO
LASALLE COUNTY CIRCUIT CLERK
OTTAWA, IL 61350

Disposition Information for Case 2011-CF-000069

2011-CF-000069 TIMOTHY PETERSON

| Case | Filed | Chg | Disposition | Disposition Type | Plea | Statute | Assessed | Due |
|---|---|---|---|---|---|---|---|---|
| | 02/07/2011 | 01 00 | 07/08/2011 208 Dismiss | 4 Court Action | 6 No Plea Entered | AGG CRIM SEX ABUSE/FAMILY | | |
| | 02/07/2011 | 02 00 | 07/08/2011 101 Guilty | 3 Guilty Plea | 2 Guilty | PREDATORY CRIMINAL SEXUAL | | |
| | | | 201 Department Of Corrxc 1 Sentence In Force | | | 7 Years | | |
| | | | 202 Jail 1 Sentence In Force | | | 154 Days | | |
| | 02/07/2011 | 03 00 | 07/08/2011 101 Guilty | 3 Guilty Plea | 2 Guilty | PREDATORY CRIMINAL SEXUAL | | |
| | | | 201 Department Of Corrxc 6 Consecutive | | | 7 Years | | |
| | | | 211 Credit Time Served 6 Consecutive | | | 154 Days | | |
| | 02/07/2011 | 04 00 | 07/08/2011 101 Guilty | 3 Guilty Plea | 2 Guilty | PREDATORY CRIMINAL SEXUAL | | |
| | | | 201 Department Of Corrxc 6 Consecutive | | | 7 Years | | |
| | | | 211 Credit Time Served 6 Consecutive | | | 154 Days | | |

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
LASALLE COUNTY, ILLINOIS

| | | |
|---|---|---|
| TIMOTHY L. PETERSON | ) | |
| Defendant/Petitioner, | ) | |
| v. | > | Case No: 2011-CF-69 |
| PEOPLE OF THE STATE OF ILLINOIS | ) | Honorable: Cynthia M. Raccuglia |
| Plaintiff/Respondant | ) | Presiding Judge |

## AMENDED POST-CONVICTION PETITION
## FOR WRIT OF CORRECTION/MODIFICATION OF SENTENCING

[P.1] Now comes, Timothy L. Peterson, Defendant, and petitions this honorable Court to grant him relief under the Post-Conviction Act. (725 ILCS 5/122-1 1992.) The Petitioner seeks this Court's inherent authority, as well as envokes jurisdiction upon the Honorable Court for a Writ of Correction/ Modification of Sentencing.

### TABLE OF CONTENTS

Grounds For Relief. . . . . . . . . . . . . . . . . pg.6
Statement Of Facts. . . . . . . . . . . . . . . . pg.7
Memorandum Of Law . . . . . . . . . . . . . . . . pg.8
BAZE v. REES, 553 U.S. 35 . . . . . . . . . . . . . . . . . . pg.8
FRAGOSO v. BELL, 210 Ariz. 427
DILLON v. STATE, 844 S.W.2d 944
MAK v. BLODGETT, 970 F.2d 614
MONTANA v. EGELHOFF, 518 U.S. 37
UNITED STATES v. CANALES, 744 F.2d 413. . . . . . . . . . pg.9
UNITED STATES v. FREDERICK, 78 F.3d 1370
UNITED STATES v. FULMER, 108 F.3d 1486
COMMONWEALTH v. JUNG, 420 Mass. 675
STATE v. GREEN, 111 Ariz. 444
UNITED STATES v. GONZALES, 121 F.3d 928
UNITED STATES v. TEHRAMI, 49 F.3d 54
YARBOROUGH v. ALVARDO, 541 U.S. 652
CONE v. BELL, 556 U.S. 449. . . . . . . . . . . . . . . . . pg.10

LEWIS v. CONNECTICUT COMMISSIONER OF CORRECTION, 790 F.3d 109.pg.10

STATE v. BRACY, 145 Ariz. 520

STATE v. COLVIN, 2016 MT 129

STATE v. EISENLORD, 137 Ariz. 385

STATE v. JOHNSON, 860 N.W.2d 235 . . . . . . . . . . . . .pg.11

STATE v. KEVIL, 111 Ariz. 240

TALAMANTE v. ROMERO, 620 F.2d 784

UNITED STATES v. AVELLINO, 136 F.3d 249

UNITED STATES v. WRIGHT, 43 F.3d 491

WHITE v. UNITED STATES, 858 F.2d 416

Ex parte LANGE, 85 U.S. 163

BENTON v. MARYLAND, 395 U.S. 784

STATE v. BROWN, 217 Ariz. 617

STATE v. JOHNSON, 860 N.W.2d 235 . . . . . . . . . . . . . pg.12

STATE v. McGILL, 213 Ariz. 147

STATE v. ORTEGA, 220 Ariz. 320

ROLAN v. VAUGHN, 445 F.3d 671

STATE v. RUNNINGEAGLE, 176 Ariz. 59

TAYLOR v. MADDOX, 366 F.3d 992

UNITED STATES v. BARNES, 662 F.2d 777

WILLIAMS v. TAYLOR, 529 U.S. 420

CHAPMAN v. CALIFORNIA, 386 U.S. 18 . . . . . . . . . . . . pg.13

SATTERWHITE v. TEXAS, 486 U.S. 249

STATE v. HART, 449 Md. 246

STATE v. IVES, 187 Ariz. 102

STATE v. SHING, 109 Ariz. 361

STATE v. WOOD, 180 Ariz. 53

UNITED STATES v. LUJANO-PEREZ, 274 F.3d 219

UNITED STATES v. MACKINS, 315 F.3d 399 . . . . . . . . . pg.14

UNITED STATES v. WILLIAMS, 435 F.3d 1148

CRIMMINS v. SUPERIOR COURT, 137 Ariz. 396

STATE v. NORIEGA, 142 Ariz. 474

UNITED STATES v. BRANDON, 17 F.3d 409

UNITED STATES v. GRAHAM, 305 F.3d 1094

UNITED STATES v. LEFTENANT, 341 F.3d 338

UNITED STATES v. OVERTON, 573 F.3d 679

ARCHER v. STATE, 986 So.2d 951 . . . . . . . . . . . . . pg.15

BARKER v. BARROW, 290 Ga. 711 . . . . . . . . . . . . . . . . . pg.15
EZE v. SENKOWSKI, 321 F.3d 110
In re CORDERO, 46 Cal.3d 161
MAK v. BLODGETT, 970 F.2d 614
McMANN v. RICHARDSON, 397 U.S. 759
STATE v. GERLAUGH, 144 Ariz. 449 . . . . . . . . . . . . . pg.16
STATE v. LEE, 142 Ariz. 210
PEOPLE v. HORTON, 906 P.2d 478
BELMONTES v. AYERS, 529 F.3d 834
COMMONWEALTH v. PIERCE, 527 A.2d 973
CORRELL v. RYAN, 539 F.3d 938
DUGAS v. COPLAN, 428 F.3d 317
GLOVER v. UNITED STATES, 531 U.S. 198
HARRIS v. WOOD, 64 F.3d 1432 . . . . . . . . . . . . . . . . pg.17
HOLSOMBACK v. WHITE, 133 F.3d 1382
JOHNSON v. MITCHELL, 585 F.3d 923
JONES v. RYAN, 583 F.3d 626
KIMMELMAN v. MORRISON, 477 U.S. 365
LINDSTADT v. KEANE, 239 F.3d 191
PAVEL v. HOLLINS, 261 F.3d 210
STATE v. TELLES, 126 N.M. 593 . . . . . . . . . . . . . . . pg.18
STATE v. YSEA, 191 Ariz. 372
THERIAULT v. STATE, 2015 ME 137
THOMPSON v. UNITED STATES, 504 F.3d 1203
UNITED STATES v. COOPER, 617 F.3d 307
UNITED STATES v. WEATHERS, 493 F.3d 229
EDWARDS v. ARIZONA, 451 U.S. 477
ILLINOIS v. PERKINS, 496 U.S. 292 . . . . . . . . . . . . . pg.19
MIRANDA v. ARIZONA, 384 U.S. 436
PHILLIPS v. STATE, 285 Ga. 213
RHODE ISLAND v. INNIS, 446 U.S. 291
STATE v. EDWARDS, 325 Conn. 97
BELL v. STATE, 294 Ga. 5 . . . . . . . . . . . . . . . . . pg.20
JONES v. UNITED STATES, 167 F.3d 1142
LEE v. UNITED STATES, 582 U.S. ____
MABRY v. JOHNSON 467 U.S. 504
CANADA v. STATE, 2015 Ark. 8

GRAHAM v. FLORIDA, 560 U.S. 48. . . . . . . . . . . . . . . . . pg.21

STATE v. BRUEGGER, 773 N.W.2d 862

STATE v. CANION, 199 Ariz. 227

STATE v. COX, 201 Ariz. 464

STATE v. GONZALES, 216 Ariz. 11

STATE v. NEWTON, 200 Ariz. 1

STATE v. SMITH, 219 Ariz. 132

STATE v. THUES, 203 Ariz. 339

UNITED STATES v. ELLSWORTH, 456 F.3d 1146

UNITED STATES v. GONZALEZ-AGULAR, 718 F.3d 1185

UNITED STATES v. JOSEPH, 716 F.3d 1273 . . . . . . . . . . pg.22

STATE v. ASBURY, 145 Ariz. 381

STATE v. STOKELY, 182 Ariz. 505

WHARTON v. CHAPPEL, 765 F.3d 953

STATE v. ARNOLDI, 176 Ariz. 236

UNITED STATES v. SUAREZ, 263 F.3d 468

UNITED STATES v. TAYLOR, 749 F.2d 1511

UNITED STATES v. WELLS, 262 F.3d 455 . . . . . . . . . . . pg.23

ILLINOIS CONSTITUTION Art. 1 § 2, 7, 8

ONE CRIME/ONE ACT

UNITED STATES v. HOGAN, 712 F. 757

STINSON v. UNITED STATES, 508 U.S. 36 . . . . . . . . . . . pg.24

UNITED STAES v. MOSS, 9 F.3d 543

UNITED STATES v. FRANKs, 46 F.3d 402

UNITED STATES v. MeMEEN, 49 F.3d 225 . . . . . . . . . . . pg.25

PEOPLE v. REEDY, 186 Ill. 2d. 1

725 ILCS 5/111-2

        Arguements

Bail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pg.25

Cumulative Error . . . . . . . . . . . . . . . . . . . . . . . pg.25

Custody and Arrest . . . . . . . . . . . . . . . . . . . . . . pg.26

Discovery and Disclosure . . . . . . . . . . . . . . . . . . . pg.26

Double Jeopardy . . . . . . . . . . . . . . . . . . . . . . . . pg.27

Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . pg.27

Harmless Error . . . . . . . . . . . . . . . . . . . . . . . . pg.27

Indictments . . . . . . . . . . . . . . . . . . . . . . . . . . pg.28

Ineffective Assistance of Counsel . . . . . . . . . . . . . . pg.29

Miranda Rights . . . . . . . . . . . . . . . . . . . . pg.32
Plea Agreements . . . . . . . . . . . . . . . . . . . . pg.33
Sentencing . . . . . . . . . . . . . . . . . . . . . . pg.34
Vindictive Prosecution . . . . . . . . . . . . . . . . pg.36
Misc. . . . . . . . . . . . . . . . . . . . . . . . . . pg.36
            Conclusion . . . . . . . . . . . . . . . . pg.37
            Affidavit . . . . . . . . . . . . . . . . . pg.38


        Exhibits
Judgment - Sentence To I.D.O.C. . . . . . . . . . . . . . Exhibit A.1 - 1
State's Attorney's Statement . . . . . . . . . . . . . . Exhibit B.1 - 2
Appellate Court Order to Remand to Circuit Court . . . . Exhibit C.1 - 1
News Article - "Champaign Man Charged With Molesting...". . Exhibit D.1 - 1
News Article - "Probation Missteps Lead To 6-Year ...". . . Exhibit E.1 - 3
PEOPLE v. FORD, 2019 Ill. App. 4th 160715 . . . . . . . . Exhibit F.1 - 7

[P.2]  In support of this petition, the Defendant states the following:

1. Defendant was originally held on Count I, which was a Class 2 Felony. Later, the States Attorney added Counts II, III, and IV.

2. Defendant was convicted of the offenses of Predatory Criminal Sexual Assault of a Child [720 ILCS 5/12-14.1(a)(1)], Counts II, III, and IV, after entering a guilty plea before the Honorable Judge Cynthia M. Raccuglia; 7 years at 85% for Count II, consecutive to 7 years at 85% for Count III, consecutive to 7 years at 85% for Count IV (for a total of 21 years at 85%) on July 8th, 2011.

3. He did appeal his conviction to the Appellate Court of Illinois where it was remanded back to the Circuit Court for compliance with Rule 604 (d), Respecting the Appointment of Counsel. Appeal was rescinded by Defendant and never re-instated. (Appellate No: **3-11-0632** in 2012)

4. Defendant did NOT petition the Supreme Court of Illinois to take his case or Petition for Leave for Appeal. (Supreme Court No: <u>n/a</u>)

5. This Petition was mailed to the Circuit Clerk within the time frame enumerated under 725 ILCS 5/122-1.

6. Petitioner's Constitutional Rights were violated on the following grounds:

## GROUNDS FOR RELIEF

[P.3]  The Petitioner cites the following grounds:

1. Defendant's Plea Deal, was in violation to his Illinois Constitution Art. § 6th, and 13th Right to Due Process. And the Equal Protection under the 14th Amendment of the United States Constitution. Where Defendant was sentenced under an erroneously applied law. Fed.R.of Crim.P. 32.

2. Petitioner's sentence does not comport with the PSR, PSI from the

Probation Department. Under Fed.R.of Crim.P. 32 Sentence, and Consec-
utive Sentencing in violation of Classification Level for sentencing
under Enhanced sentence guidelines.

3. Petitioner's sentence, although being under Plea, was in violate
to Illinois Constitution Art. § 6th, and 13th. Also the 5th, 6th, and
14th Amendments of the United States Constitution. Being sentenced
under guidelines, being of Consecutive, Concurrent Sentencing Guide-
lines, in violation of Defendant's 6th, and 14th Amendment US Consti-
tutional Rights. Also the Illinois Constitution Art. § 6th, and 13th,
of the One Crime/One Act of the Due Process Clause of our Illinois
Constitution.

4. Petitioner entered a Plea unintelligently, due to In-Effective Assist-
ance of Counsel. Where the Court's application of incorrect base level
offense is Clear Error. There was a misaplication or miscalculation of
the U.S.S.G. in Petitioner's case herein, during his Plea/Sentencing
Phase. Fed.R.Crim.P. 32(b)(6)(A). Plea Deal, Sentence Enhancements,
Not Investagated. See Johnson v. Uribe, 700 F. 3d 713 (CA 9 2013).
P.C. § 667.5(5). Misunderstanding of the Law Surrounding Sentencing
Enhancement.

5. Additionally, the Honorable Judge Heidi Ladd of the Champaign County
Circuit Court ruled that the original charging instrument of Predatory
Criminal Sexual Assault against Christain M. Ford was Unconstitutional.
His charge was reduced to Criminal Sexual Abuse by a Family Member,
which is a Class-2 offense. People v. Ford (2014-CF-450).

## STATEMENT OF FACTS

[P.4] (NOTE: Quoted from State's Attorney's Statement, and in no way means
I agree with every word, as will be argued later in this Petition.) FACTS
AND CIRCUMSTANCES OF OFFENSE: "In early February, 2011, officers began an
investigation into the defendant for sexually molesting his daughter for the
(last sever years). His daughter, who is now eleven, stated that her father
has been "putting his thing in her thing" for (several years) now, almost
once a week. She stated when he does this, he moves up and down and then
"catches white stuff in his hand." She also stated he also fondles her vagina

with his fingers and puts his fingers in her vagina.  She stated he also puts his penis in her mouth.  (The defendant was interviewed and admitted to doing inappropriate sexual things with his daughter.)"

[P.5]  The alledged date of offense was January 22, 2011 (see Judgment Order).  Only one date is listed; and there was only one victim; and the charges were of a single course of conduct.  The Defendant entered or accepted a Plea Deal.  To which he plead guilty to the charges of Predatory Criminal Sexual Assault of a Child, being Counts II, III, and IV (Count I was dropped as part of Plea), on the date of July 8, 2011, before Judge Cynthia M. Raccuglia.  The Defendant was sentenced to 21 years of incarceration in the Illinois Department of Corrections on the date of July 8, 2011.

### MEMORANDOM OF LAW

#### Bail

[P.6] BAZE v. REES, 553 U.S. 35, 46, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008): The Excessive Bail Clause of the Eighth Amendment is applicable to the states through the Fourteenth Amendment.

[P.7] FRAGOSO v. BELL, 210 Ariz. 427, 111 P.3d 1027 (App. 2005):  A trial court's discretion to set conditions of bail is not unfettered.  A judicial officer setting bail must impose the least onerous condition or conditions which will reasonably assure the person's appearance.

#### Cumulative Error

[P.8] DILLON v. STATE, 844 S.W.2d 944, 948 (Ark. 1993):  The defendant's conviction for rape required reversal due to the accumulation of errors.

[P.9] MAK v. BLODGETT, 970 F.2d 614, 622 (9th Cir. 1992):  Multiple errors, even if harmless individually, may entitle a petitioner to relief if their cumulative effect prejudiced a defendant.

[P.10] MONTANA v. EGELHOFF, 518 U.S. 37, 53, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996):  Erroneous evidentiary rulings can, in combination, rise to the level

of a due process violation.

[P.11] UNITED STATES v. CANALES, 744 F.2d 413, 430 (5th Cir. 1984): Cumulative effect of several incidents of improper arguement or misconduct may require reversal though no single incident alone warrants reversal.

[P.12] UNITED STATES v. FREDERICK, 78 F.3d 1370, 1381 (9th Cir. 1996): The court opined that, "in some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." If the "government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors."

[P.13] UNITED STATES v. FULMER, 108 F.3d 1486 (1st Cir. 1997): Individually harmless errors may be harmful when considered cumulatively.

Custody and Arrest

[P.14] COMMONWEALTH v. JUNG, 420 Mass. 675, 688 (1995): Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

[P.15] STATE v. GREEN, 111 Ariz. 444, 532 P.2d 506 (1975): A defendant is arrested when his liberty of movement is interrupted and restrained by the police. Whether such a restriction has occurred is determined by an objective evaluation of the evidence and not the subjective belief of the parties.

[P.16] UNITED STATES v. GONZALES, 121 F.3d 928, 939 (5th Cir. 1997): Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody.

[P.17] UNITED STATES v. TEHRAMI, 49 F.3d 54 (2nd Cir. 1995): The length of detention may be so excessive as to convert it to an arrest.

[P.18] YARBOROUGH v. ALVARDO, 541 U.S. 652, 663-65, 124 S.Ct. 2140, 158 L.Ed. 2d 938 (2004): Custody is the deprivation of freedom of action in any significant way.

10

Discovery and Disclosure

[P.19] CONE v. BELL, 556 U.S. 449, 129 S.Ct. 1769, 1782, 173 L.Ed.2d 701 (2009): When the state withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his due process of law in violation of the Fourteenth Amendment. Evidence is 'material' within the meaning of **Brady** when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.

[P.20] LEWIS v. CONNECTICUT COMMISSIONER OF CORRECTION, 790 F.3d 109 (2nd Cir. 2015): Evidence which must be disclosed is evidence is "of a kind that would suggest to any prosecutor that the defense would want to know about it."

[P.21] STATE v. BRACY, 145 Ariz. 520, 703 P.2d 464 (1985): The United States Constitution requires the prosecution to disclose to a defendant information that would tend to absolve the defendant of guilt or mitigate his punishment. This disclosure requirement exists regardless of the good faith or bad faith of the prosecution. Although the prosecution suppressed exculpatory evidence, a new trial was not warranted. The prosecution's failure to disclose exculpatory evidence to a defendant will result in a new trial when suppressed evidence is material.

[P.22] STATE v. COLVIN, 2016 MT 129, 372 P.3d 471 (2016): A **Brady** violation of due process occurs when the defendant establishes that the State possessed evidence that had exculpatory or impeachment value to the defense; the evidence was willfully or inadvertently suppressed; and that the suppression prejudiced the defense. The last element-prejudice to the defense - is sometimes stated in terms of a burden to show that the outcome of the proceedings would have been different had the evidence been provided. The defendant is not required to show that the evidence would have led to acquittal, and the defendant meets his burden by showing that suppression of the evidence was prejudicial to the defense.

[P.23] STATE v. EISENLORD, 137 Ariz. 385, 670 P.2d 1209 (App. 1983): The choice of sanctions is within the trial court's discretion when there is a discovery/disclosure violation.

[P.24] STATE v. JOHNSON, 860 N.W.2d 235 (S.D. 2015): In a sexual abuse case, the state failed to provide, or purposely withheld, the physical examination report of a child which was conducted following her forensic interview. The defense did not learn of the report untill after sentencing. The case was remanded with an order for the state to disclose the report and hold an evidentiary hearing to determine if there was a disclosure violation.

[P.25] STATE v. KEVIL, 111 Ariz. 240, 527 P.2d 285 (1974): Discovery rulings are reviewed for abuse of discretion.

[P.26] TALAMANTE v. ROMERO, 620 F.2d 784, 788 (10th Cir. 1980): Good or bad faith of prosecutor may play a role in materiality determination for Brady purposes.

[P.27] UNITED STATES v. AVELLINO, 136 F.3d 249, 255-58 (2nd Cir. 1998): A knowing and voluntary guilty plea is subject to challenge if a Brady violation occurs. The government's obligation to disclose Brady material is pertinent to determination of whether to plead guilty or not.

[P.28] UNITED STATES v. WRIGHT, 43 F.3d 491, 496 (10th Cir. 1994): Under limited circumstances, a Brady violation can render a defendant's guilty plea involuntary.

[P.29] WHITE v. UNITED STATES, 858 F.2d 416, 422 (8th Cir. 1988): The voluntariness of guilty plea can be challenged on a Brady violation.

Double Jeopardy

[P.30] Ex parte LANGE, 85 U.S. 163, 21 L.Ed. 872 (1873): Double jeopardy protection applies to both misdemeanor and felony charges.

[P.31] BENTON v. MARYLAND, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969): The Fourteenth Amendment's Due Process Clause extends the Fifth Amendment's Due Process Clause to state prosecutions.

[P.32] STATE v. BROWN, 217 Ariz. 617, 177 P.3d 878 (App. 2008): The double jeopardy clause of the Arizona Constitution and the U.S. Constitution protects criminal defendants from multiple convictions and punishments for the

same offense.

[P.33] STATE v. JOHNSON, 860 N.W.2d 235 (S.D. 2015): Double jeopardy protects against three types of government abuses; 1) a second prosecution for the same affense after acquittal; 2) a second prosecution for the same offense after conviction; and, 3) multiple punishments for the same offense.

[P.34] STATE v. McGILL, 213 Ariz. 147, 153, 140 P.3d 930, 936 (2006): A double jeopardy violation constitutes fundamental, prejudicial error.

[P.35] STATE v. ORTEGA, 220 Ariz. 320, 206 P.3d 769, 772 (App. 2008): The Double Jeopardy Clauses of the United States and Arizona Constitutions protect criminal defendants from multiple convictions and punishments for the same offense.

Evidentiary Hearing

[P.36] ROLAN v. VAUGHN, 445 F.3d 671, 680 (3rd Cir. 2006): Petitioner was entitled to evidentiary hearing despite failure to develop facts in post-conviction relief petition because developed factual basis in state court.

[P.37] STATE v. RUNNINGEAGLE, 176 Ariz. 59, 63, 859 P.2d 169, 173 (1993): A defendant is entitled to an evidentiary hearing on a petition for post-conviction relief, where a colorable claim is presented.

[P.38] TAYLOR v. MADDOX, 366 F.3d 992, 1001 (9th Cir. 2004): If, "a state court makes evidentary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts."

[P.39] UNITED STATES v. BARNES, 662 F.2d 777 (D.C. Cir. 1980): The trial court violated defendant's Sixth Amendment right to counsel where it conducted an evidentiary hearing in absence of defendant's chosen counsel.

[P.40] WILLIAMS v. TAYLOR, 529 U.S. 420, 437, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000): Diligence requires, "at a minimum, seek[ing] an evidentiary hearing in state court in the manner prescribed by law."

Harmless Error

[P.41] CHAPMAN v. CALIFORNIA, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967): Before a federal constitutional error may be held harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

[P.42] SATTERWHITE v. TEXAS, 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988): If a Sixth Amendment violation pervades the entire proceeding, harmless error analysis is inapplicable and the violation is enough to overturn a conviction.

[P.43] STATE v. HART, 449 Md. 246, 144 A.3d 609 (2016): Once error is established, the burden is on the State to show that it was harmless beyond a resonable doubt. The record must affirmatively show that the communication (or response or lack of response) was not prejudicial. The harmless error standard is highly favorable to the defendant. An ambiguous record cannot support a harmless error argument, and if an ambiguous record is insufficient, so, surely, is a silent record. The court held that it was reversible error when the trial court responded to a jury note without first conducting an adequate inquiry into the voluntariness of the defendant's absence from the court proceedings.

[P.44] STATE v. IVES, 187 Ariz. 102, 927 P.2d 762 (1996): A court will not find harmless error unless it is convinced that tainted evidence has no impact.

[P.45] STATE v. SHING, 109 Ariz. 361, 509 P.2d 698 (1973): A violation of the defendant's Fifth Amendment right exercising the right to remain silent or even a specific comment against a defendant exercizing that right is not harmless error.

[P.46] STATE v. WOOD, 180 Ariz. 53, 881 P.2d 1150 (1994): "[W]e cannot and do [] not determine error is harmless merely because the record contains sufficient untainted evidence."

[P.47] UNITED STATES v. LUJANO-PEREZ, 274 F.3d 219, 225 (5th Cir. 2001): The failure to determine if the defendant understood the nature of the charges

against him was not harmless error.

[P.48] UNITED STATES v. MACKINS, 315 F.3d 399, 409-11 (4th Cir. 2003): An Apprendi error was not harmless when defendant may have been sentenced differently absent the error.

[P.49] UNITED STATES v. WILLIAMS, 435 F.3d 1148, 1163 (9th Cir. 2006): A Fifth Amendment violation admitting unconstitutional confession was not harmless because error 'went to heart' of case.

Indictments

[P.50] CRIMMINS v. SUPERIOR COURT, 137 Ariz. 396, 668 P.2d 882 (1983): An accused is entitled to due process during grand jury proceedings. Due process requires the use of an unbiased grand jury and a fair and impartial presentation of the evidence.

[P.51] STATE v. NORIEGA, 142 Ariz. 474, 690 P.2d 775 (1984): An enhanced indictment is forbidden, even in the absence of proof of actual retaliatory motivation on the part of the prosecutor, because of the chilling effect on the exercise of the defendant's rights.

[P.52] UNITED STATES v. BRANDON, 17 F.3d 409, 422 (1st Cir. 1994): Multiplicitous indictment violates the Double Jeopardy Clause because it raises danger that a defendant will receive more than 1 sentence for a single crime.

[P.53] UNITED STATES v. GRAHAM, 305 F.3d 1094, 1100-01 (10th Cir. 2002): An indictment charging 3 counts for 3 separate transactions was multiplicitous when the statute punishes continuing conduct rather than separate offenses.

[P.54] UNITED STATES v. LEFTENANT, 341 F.3d 338, 347-48 (4th Cir. 2003): An indictment charging 6 counts of possessing counterfeit currency was multiplicitous because the defendant possessed all items on a single occasion.

[P.55] UNITED STATES v. OVERTON, 573 F.3d 679, 695 (9th Cir 2009): The government can indict and prosecute a defendant for both receipt and possession of child pornography, entering judgment of conviction for both is multiplicitous

and constitutionally impermissible when based on the same conduct.

### Ineffective Assistance of Counsel

[P.56] ARCHER v. STATE, 986 So.2d 951, 955 (Miss. 2013): Issues of ineffective assistance of counsel are most appropriately raised in post-conviction proceedings. This is because "during direct appeals the Court is limited to the trial record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately."

[P.57] BARKER v. BARROW, 290 Ga. 711, 712, 723 SE.2d 905 (2012): The standard for establishing the ineffective assistance of either trial counsel or appellate counsel is set forth by **Strickland v. Washington.**

[P.58] EZE v. SENKOWSKI, 321 F.3d 110, 112 (2nd Cir. 2003): Ineffective assistance of counsel may still be demonstrated where counsel performs competently in some respects but not in others. When a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the "vagaries of abuse indica" is critical. The importance of consultation and pre-trial investigation is heightened where physical evidence is less than conclusive and open to interpretation.

[P.59] In re CORDERO, 46 Cal.3d 161, 180 (1988): A "reasonable probability" is not a showing that "counsel's conduct more likely than not altered the outcome in the case," but simply "a probability sufficient to undermine confidence in the outcome."

[P.60] MAK v. BLODGETT, 970 F.2d 614 (9th Cir. 1992): A court is permitted to analyze prejudice from the totality of counsel's errors and omissions.

[P.61] McMANN v. RICHARDSON, 397 U.S. 759, 771, 90 S.Ct. 1141, 27 L.Ed.2d 763 (1970): A Sixth Amendment right to counsel is a right to effective counsel.

[P.62] STATE v. GERLAUGH, 144 Ariz. 449, 698 P.2d 694 (1985): A petitioner claiming ineffective assistance of counsel is entitled to relief if there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." A 'reasonable probability' is "less than more likely than not but more than a mere possibility."

[P.63] STATE v. LEE, 142 Ariz. 210, 220, 689 P.2d 153, 163 (1994): Quoting **Strickland**, "The right to counsel is the right to effective assistance of counsel."

[P.64] PEOPLE v. HORTON, 906 P.2d 478, 501 (Cal. 1995): A conflict of interest arises when counsel's "loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interest."

[P.65] BELMONTES v. AYERS, 529 F.3d 834 (9th Cir. 2008): Counsel performs deficiently where he fails to provide trier of facts with most compelling evidence in his possession, even if he offers some evidence and argument in defendant's favor.

[P.66] COMMONWEALTH v. PIERCE, 527 A.2d 973, 975 (Pa. 1987): Challenges to the effectiveness of trial counsel require the petitioner to prove: 1) the underlying legal claim was of arguable merit; 2) counsel had no reasonable strategic basis for his action or inaction; and, 3) the petitioner was prejudiced-that is, but for counsel's deficient stewardship, there is a reasonable likelihood the outcome of the proceedings would have been different.

[P.67] CORRELL v. RYAN, 539 F.3d 938, 949 (9th Cir. 2008): When evaluating counsel's performance, an "uninformed strategy" is "no strategy at all."

[P.68] DUGAS v. COPLAN, 428 F.3d 317, 332 (1st Cir. 2005): Counsel's failure to investigate possible defense was ineffective assistance.

[P.69] GLOVER v. UNITED STATES, 531 U.S. 198, 204-04, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001): Counsel's error at sentencing resulting in a 6 to 21-month sentence increase could establish ineffective assistance of counsel.

[P.70] HARRIS v. WOOD, 64 F.3d 1432, 1439 (9th Cir. 1995): The cumulative impact of multiple errors by counsel can amount to ineffective assistance of counsel. Counsel's failure to retain an investigator and interview many of the individuals identified in the police reports was deficient performance.

[P.71] HOLSOMBACK v. WHITE, 133 F.3d 1382, 1385-89 (11th Cir. 1998): Counsel's failure to investigate lack of medical evidence to support sexual abuse allegations was ineffective assistance.

[P.72] JOHNSON v. MITCHELL, 585 F.3d 923, 945 (6th Cir. 2009): Counsel's failure to discover and present mitigating evidence was ineffective assistance.

[P.73] JONES v. RYAN, 583 F.3d 626, 646-47 (9th Cir. 2009): Counsel's failure to investigate and present mitigating evidence was prejudicial because it gave sentencing judge inaccurate view of defendant's life.

[P.74] KIMMELMAN v. MORRISON, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986): Counsel's failure to conduct any pretrial discovery and file timely motion was prejudicial because counsel was ignorant of law and below prevailing professional norms. A single, serious error may support a claim of ineffective assistance of counsel.

[P.75] LINDSTADT v. KEANE, 239 F.3d 191, 202 (2nd Cir. 2001): Defense Counsel's failure to consult an expert regarding physical evidence of vaginal trauma in a sexual abuse case, or to request copies of the underlying studies relied upon by the prosecution's expert witness, contributed significantly to trial counsel's ineffectiveness. Counsel's lack of familiarity with pertinent sexual abuse studies and failure to conduct any relevant research 'hamstrung' his effort to effectively cross-examine the prosecution's expert witness.

[P.76] PAVEL v. HOLLINS, 261 F.3d 210, 223-25 (2nd Cir. 2001): Counsel was ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation. The Court found that a criminal defendant had been prejudiced by counsel's failure to call a medical expert witness to testify, or at least advise counsel, concerning indicia of

physical abuse in a child molestation case.

[P.77] STATE v. TELLES, 126 N.M. 593, P.2d 845 (1999): A defendant's proper avenue of relief from ineffective assistance of counsel, is a post-conviction proceeding that can develop a record.

[P.78] STATE v. YSEA, 191 Ariz. 372, 956 P.2d 499 (1998): A defendant may seek relief from a conviction on the basis that counsel's ineffective assistance induced a guilty plea.

[P.79] THERIAULT v. STATE, 2015 ME 137, 125 A.3d 1163 (2015): A criminal defendant is prejudiced by constitutionally ineffectice representation when the result of the proceeding is "unreliable." Under **Strickland**, therefore, the trial court must engage in an analysis that is not quantitive-that is, to determine if prejudice is probable. Rather, the court's analysis must be qualitive in nature-that is, to determine whether the petitioner has demonstrated that trial counsel's performance undermines confidence in the outcome of the case and renders that outcome unreliable.

[P.80] THOMPSON v. UNITED STATES, 504 F.3d 1203, 1208 (11th Cir. 2007): Counsel's failure to consult with defendant regarding appeal of sentence was prejudicial because reasonable probability that defendant would have appealed.

[P.81]UNITED STATES v. COOPER, 617 F.3d 307, 313 (4th Cir. 2010): Even if a client does not expressly request an appeal, counsel must consult with the client about an appeal when a rational defendant would want to appeal or a client expresses an interest in appealing. Dereliction in such a duty constitutes deficient performance.

[P.82] UNITED STATES v. WEATHERS, 493 F.3d 229, 237 (D.C. Cir. 2007): Counsel's failure to challenge counts against defendant as multiplicitous was ineffective assistance because not based on reasoned tactical decision.

Miranda Rights

[P.83] EDWARDS v. ARIZONA, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981): An accused having expressed his desire to deal with the police only

through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police.

[P.84] ILLINOIS v. PERKINS, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990): **Miranda** warnings must be given only when a suspect is both in custody and about to be subject to government interrogation. The court reasoned that custody and interrogation "may create mutually reinforcing pressures" that can overcome the suspect's will. **Miranda** warnings are not required for conversations with a government informant because the defendant was unaware there was a criminal investigation underway and was unaware the informant was cooperating with the government.

[P.85] MIRANDA v. ARIZONA, 384 U.S. 436, 448-50, 455, 86 S.Ct. 1602, 16 L. Ed.2d (1966): Before questioning suspects in custody, law inforcement officials must inform them that: 1) they have the right to remain silent; 2) their statements may be used against them; 3) they have the right to the presence of an attorney during questioning; and, 4) if they cannot afford an attorney, one will be appointed for them. Absent proof that proper warnings were given and valid waiver of rights was made by the accused, evidence obtained through custodial interrogation is inadmissible at trial.

[P.86] PHILLIPS v. STATE, 285 Ga. 213, 215, 675 S.E.2d 1 (2009): A statement obtained in violation of **Miranda** is inadmissible in the state's case-in-chief, regardless of whether statement is incriminating, because **Miranda** covers the response-whether inculpatory of exculpatory-that the prosecution may seek to introduce at trial.

[P.87] RHODE ISLAND v. INNIS, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed. 2d 297 (1980): The court defined an interrogation as "express questioning or its functional equivalent."

[P.88] STATE v. EDWARDS, 325 Conn. 97, 156 A.3d 506 (2017): The following nonexclusive list of factors should be considered in determining whether a suspect was in custody for purposes of **Miranda**: 1) the nature, extent and duration of the questioning; 2) whether the suspect was handcuffed or otherwise physically restrained; 3) whether officers explained that the suspect

was free to leave or not under arrest; 4) who initiated the encounter; 5) the location of the interview; 6) the length of detention; 7) the number of officers in the immediate vicinity of the questioning; 8) whether the officers were armed; 9) whether the officers displayed their weapons or used force of any other kind before or during questionings; and 10) the degree to which the suspect was isolated from friends, family and the public.

Plea Agreements

[P.89] BELL v. STATE, 294 Ga. 5, 8, 749 S.E.2d 672 (2013): A defendant who knowingly enters into a plea agreement does not waive the right to challenge an illegal and void sentence.

[P.90] JONES v. UNITED STATES, 167 F.3d 1142, 1145 (7th Cir. 1999): Justice dictates that a claim of ineffective assistance of counsel in connection with the negotiation of a cooperation agreement cannot be barred by the agreement itself-the very product of alleged ineffectiveness. To hold otherwise would deprive a defendant of an opportunity to assert his Sixth Amendment right to counsel where he had accepted the waiver in reliance on delinquent representation.

[P.91] LEE v. UNITED STATES, 582 U.S. ___, 137 S.Ct. 1958, 1965, 198 L.Ed.2d 476 (2017): When a petitioner claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, he can show prejudice by demonstrating a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

[P.92] MABRY v. JOHNSON, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984): A defendant who is not fairly apprised of the consequences of a plea can challenge the plea under the due process clause.

Sentencing

[P.93] CANADA v. STATE, 2015 Ark. 8, WL 224981, ___ S.W.3d ___ (2015): A claim that a sentence is illegal presents an issue of subject matter jurisdiction that can be addressed at any time under section 16-90-111(a).

[P.94] GRAHAM v. FLORIDA, 560 U.S. 48, 59-60, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010): While strict proportionality between crime and sentence is not required, a punishment will be deemed "cruel and unusual" when it is "grossly dispro-portionate to the crime." An appellant can challenge the length of a term of years' sentence "given all the circumstances in a particular case." This would be considered an as-applied challenge.

[P.95] STATE v. BRUEGGER, 773 N.W.2d 862, 872 (Iowa 2009): The court held that when the claim is that the sentence itself is inherently illegal, whether based on the constitution or statute, the claim may be asserted at any time.

[P.96] STATE v. CANION, 199 Ariz. 227, 16 P.3d 788 (App. 2000): An illegal sentence constitutes fundamental error that will be reversed on appeal despite a lack of objection in the trial court.

[P.97] STATE v. COX, 201 Ariz. 464, 37 P.3d 437 (App. 2002): The imposition of an illegal sentence constitutes fundamental error.

[P.98] STATE v. GONZALES, 216 Ariz. 11, 162 P.3d 650 (App. 2007): Illegal sentence requires correction upon an appeal by the defendant.

[P.99] STATE v. NEWTON, 200 Ariz. 1, 21 P.3d 387 (2001): A basic principle of criminal law requires that an offender be sentenced under the laws in effect at the time he committed the offense for which he is being sentenced.

[P.100] STATE v. SMITH, 219 Ariz. 132, 135-36, 194 P.3d, 402-03 (2008): An illegal sentence constitutes fundamental error.

[P.101] STATE v. THUES, 203 Ariz. 339, 54 P.3d 368 (App. 2002): An illegal sentence is fundamental and inherently prejudicial error.

[P.102] UNITED STATES v. ELLSWORTH, 456 F.3d 1146, 1149 (9th Cir. 2009): The constitutionality of a sentencing guideline is reviewed de novo.

[P.103] UNITED STATES v. GONZALEZ-AGUILAR, 718 F.3d 1185, 1189 (9th Cir. 2013): To demonstrate prejudice for a sentencing error, a defendant need not show with absolute certainty that he would have received a lesser sentence

in the absence of the error, he need only show a "reasonable probability" of such.

[P.104] UNITED STATES v. JOSEPH, 716 F.3d 1273, 1280 (9th Cir. 2013): In a sentencing context, when a plain error may have led to a sentence that was longer than necessary, that error affects substantial rights.

[P.105] STATE v. ASBURY, 145 Ariz. 381, 701 P.2d 1189 (App. 1984): The right to a pre-sentence mitigation hearing is an absolute right and the only limitation as to timeliness is that it must be requested prior to sentencing.

[P.106] STATE v. STOKELY, 182 Ariz. 505, 523, 898 P.2d 454, 472 (1995): The lack of prior felony convictions constitutes a non-statutory mitigator, but misdemeanors and prior arrests may be considered in assessing this factor.

[P.107] WHARTON v. CHAPPEL, 765 F.3d 953 (9th Cir. 2014): Childhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event.

[P.108] STATE v. ARNOLDI, 176 Ariz. 236, 860 P.2d 503 (App. 1993): The defendant was convicted of sexual conduct with a minor and molestation arising from the same event. The trial court imposed consecutive sentences and the court of appeals ordered the sentences to be run cuncurrent. The court determined that committing molestation did not cause harm to the victim in addition to that already caused by the sexual conduct.

Vindictive Prosecution

[P.109] UNITED STATES v. SUAREZ, 263 F.3d 468, 480 (6th Cir. 2001): Generally, a potentially vindictive superseding indictment must add additional charges or substitute more severe charges based on the same conduct charged less heavily in the first indictment.

[P.110] UNITED STATES v. TAYLOR, 749 F.2d 1511, 1513 (11th Cir. 1985): A presumption of vindictiveness when prosecutor brought charge carrying potentially greater sentence than original charge because circumstances demonstrated either actual vindictiveness or realistic fear of vindictiveness.

[P.111] UNITED STATES v. WELLS, 262 F.3d 455, 466 (5th Cir. 2001): A presumption of prosecutorial vindictiveness may arise in pretrial context. A court should not distinguish between pre-trial and post-trial vindictiveness.


Misc.


[P.112] ILLINOIS CONSTITUTION Art. 1 § 2, 7, and 8. Due Process Violation/ Manifest Error at Trial: Petitioner herein, brings his Motion under the Post-Conviction Hearing Act collaterally attacking his judgment of conviction.


[P.113] ONE CRIME/ONE ACT Provisions as Expressed Under Art. § 6 of the Illinois Constitution: Wherein, the allegations of constitutional violations that were not, and could not have been raised previously before the court. The Petitioner in his cause of action has suffered a substantial deprivation of constitutional rights. Therefore, the Petitioner is entitled to an hearing on these matters. To address the manifest errors that are Unconstitutional, and are structoral errors, having occurred during the Petitioner's pre-trial, and post-trial appeals. As in the case herein before this honorable court.


[P.114] UNITED STATES v. HOGAN, 712 F. 757, 759 (2nd Cir. 1983): Such errors were plain, and were therefore a part of the Petitioner's trial, but also during the sentencing phase, in violation to Petitioner's constitutional rights of the 5th, 6th, and 14th U.S.C.A. to Due Process, and the Equal Protections of both state and federal constitutions, concerning the equally protected rights to receive a PSR/PSI from the Probation Department. To determine Petitioner's classification level for sentencing. And also to determine elligability for enhancements, due to a prior background. On that, midigation factors are presented by the Probation Officer, in warranting departure of such enhancements, as pre-qualifying factors being expressed by the States Attorney. Under Fed.R.ofCrim.P. 32.


[P.115] I would have also at that point, received my constitutional right to read, or to be aware of, if any, background reports, or pre-qualifiers for enhancements, as requested by the state. In that the state sought the Mandatory Consecutive Sentencing & Enhancements, being a Double-Enhancement Factor, which would have had to be decided by the Probation Department.

And submitted before an empanelled jury. Or that I decide to have a bench
trial, where a judge would have determined if I qualified for the aggravated
enhancers, being based upon a dispositive background, and there being no
midigation factors present, or presented by the Probation Department.

[P.116] And my lawyer and I would have been provided a copy of those reports.
And that my attorney and I be made fully aware of those reports, so that,
under the 5th and 6th Amendment Constitutional rights, that my attorney and
I would have sought through Motions, and for a trial, in order to seek a
downward departure of the requested sentencing ranges, being under Mandatory
Concurrent - or under a Concurrent sentencing guideline.

[P.117] STINSON v. UNITED STATES, 508 U.S. 36 (1993): Based upon the Illi-
nois Constitution Art. § 6th and 13th, being of the "One Crime - One Act"
provisions of the constitution. But also the Equal Protection of the Law,
and the Illinois Constitution. As expressed by the 14th U.S.C.A. See also
Fed.R.Crim.P. 32(b)(6)(A).

[P.118] UNITED STATES v. MOSS, 9 F.3d 543 (5th Cir. 1993): Where the court's
application of incorrect base level offense is clear error. There was a
misapplication or a miscalculation of the U.S.S.G., in petitioner's case
during his trial, and sentencing phase. Fed.R.Crim.P. 32(b)(6)(A). Also
see UNITED STATES v. YAZZIE, 407 F.3d 1139 (Ca. 10 2005). Standard Proof for
Sentencing Guidelines.

[P.119] UNITED STATES v. FRANKS, 46 F.3d 402 (5th Cir. 1995): Where there
had been an application of the wrong section U.S.S.G., and the misapplica-
tion of grouping provisions, which constitutes plain error. Trial judge
sentenced defendant to, or under a guideline, which was misapplied, due to
lack in PSI/PSR reports, and a correct base level offense, which violated
defendant's Sixth Amendment right to due process of the law. And the 14th
Amendment right to Equal Protections of the Illinois statutorial laws, applic-
able to the defendant's charges. See STINTON v. UNITED STATES, 508 U.S. 36
(1993); UNITED STATES v. MOSS, 9 F.3d 543 (5th Cir. 1993); and UNITED STATES
v. YAZZIE, 407 F.3d 1139 (CA 10 2005). Standard Proof for Sentencing Guide-
lines.

[P.120] UNITED STATES v. McMEEN, 49 F.3d 225 (6th Cir. 1995): The information provided by the Probation Officer must be based on some sort of specific evidence and not just conjecture or speculation on the part of the Probation Officer.

[P.121] PEOPLE v. REEDY, 186 Ill. 2d. 1, 708 N.E.2d 1114, 237 Ill. Dec. 74 (1999): Public Act 89-404 ("Truth-In-Sentencing") was held to be unconstitutional. "Curative legislation may validate only actions taken in reliance on an unconstitutional statute. Curative legislation cannot validate or legalize the unconstitutional legislation itself." See JOHNSON, 176 Ill. 2d at 522-23, citing PEOPLE ex rel. PATTERSON v. WOODRUFF, 280 Ill. 472, 476, 117 N.E. 791 (1917).

[P.122] 725 ILCS 5/111-2 Commencement of Prosecution: All prosecution of felonies shall be by information, or by indictment. No prosecution may be pursued by information unless a preliminary hearing has been held or waived in accordance with Section 109-3, at that hearing of probable cause. Section 109-3.1 of Criminal Procedure.

ARGUEMENTS

Bail

[P.123] High Bail: $300,000 for bail violates Eigth Amendment of the United States Constitution, since the purpose of bail is to ensure the accused will show up for court. Defendant's annual income was only about $30,000, thus bail demand would have been impossible to meet. Also, it was never determined that the defendant was any sort of an escape/flight risk. This violates "excessive bail shall not be required..." Exhibit Pub. Rec.

Cumulative Error

[P.124] Due to the lack of a "Frank's Hearing" to determine if the custodial interrogation was done according to the law and its due process safeguards; filing a Miranda Rights Violation which was never followed up on, concerning an illegally obtained statement; not challenging multiplicity of charges; not challenging severity of charges; not challenging Grand Jury indictment;

not thoroughly investigating or challenging the state's evidence or reports;
not challenging with Motions that charges violate One Crime, One Act doctrine;
not challenging constitutionality of charges; not challenging State's theory;
not hiring an investigator; not challenging the erronious misapplication of
sentencing guidelines; failling to property advise defendant, among other
errors which had a cumulative effect towards prejudicing the defendant and
result in due process violations. (See DILLON v. STATE; MAK v. BLODGETT;
MONTANA v. EGELHOFF; US v. CANALES; US v. FREDERICK; & US v. FULMER.)

EXHIBIT Pub. Rec.

Custody and Arrest

[P.125] I was told to come with the police officer to the station for quest-
ioning. I had to bring my 2 young sons with me. We were in the police sta-
tion for most of the day. Police initiated questioning during this time.
At no time did I feel that I was free to leave. Though not in handcuffs, I
felt my my libery and freedom were otherwise restricted. 2 officers and a
Sergeant were present at all times. Custody was so long that is could be
considered to have been converted to an arrest, long before I was formally
held to be under arrest. (See COMMONWEALTH v. JUNG; STATE v. GREEN; US v.
GONZALES; US v. TEHRAMI; and YARBOROUGH v. ALVARDO.)     EXHIBIT Pub. Rec.

Discovery and Disclosure

[P.126] Defendant was given an envelope marked "DISCOVERY." All it contained
was a "Bill of Particulars" that listed what would be in the Discovery. This
is NOT evidence. To date, I have yet to see the transcripts of the statements
made by my wife (at the time), and the victim. In addition, there were pos-
sibly some tests or examinations listed. To date, I do NOT know what the
results/determinations were, if any. Also listed was a number of reports
made by various officials that I have no knowledge of what was or was not said.
This appears to be a clear violation of discovery/disclosure. Nor did counsel
request a Brady hearing to determine the status of each piece of evidence.
This would also be a Fourteenth Amendment violation to Due Process. (See
CONE v. BELL; LEWIS v. CONN. COMM. OF CORR.; STATE v. BRACY; STATE v. COLVIN;
STATE v. EISENLORD; STATE v. JOHNSON; STATE v. KEVIL; TALAMANTE v. ROMERO;
US v. AVELLINO, US v. WRIGHT; and WHITE v. US.)     EXHIBIT Pub. Rec.

[P.127] Petitioner also states that, if his sentencing judge had received additional information, which was excluded from his PSR, but which may be used in determining an accurate sentence, the judge must give the defendant and/or his attorney an opportunity to respond to that information discovered through investigations by the Probation Officer assigned to defendant's case. The Petitioner herein, had not received his Due Process rights under Illinois Constitution Art. § 6th, and 13th, and also the U.S.C.A. 5th, 6th, and 14th. (See Fed.R.Crim.P. 32(c)(3)(A).)                    Exhibit Pub. Rec.


   Double Jeopardy


[P.128] Double jeopardy protection applies to both misdemeanor any felony charges. The 14th Amendment's Due Process clause extends to the 5th Amendment's Due Process Clause to state prosecutions as well. The double jeopardy clause of the U.S. Constitution protects criminal defendants from multiple convictions and punishments for the same offense. A double jeopardy violation constitutes fundamental, prejudicial error. As in this case before the honorable judge, the defendant was given 3 of the same Class-X charges for the same victim, from the single course of conduct, with the same date of offense being listed in the judge's order. (See Ex parte LANGE; BENTON v. MARYLAND; STATE v. BROWN; STATE v. JOHNSON; STATE v. McGILL; and STATE v. ORTEGA.)                    Exhibit A.1 of 1


   Evidentiary Hearing


[P.129] The Petitioner is entitled to an evidentiary hearing even despite a failure to develop facts in post-conviction relief petition because developed factual basis in state court. Also Petitioner is entitled to an evidentiary hearing on a petition for post-conviction relief, where a colorable claim is presented. Wherefore, the Petitioner requests this evidence offered in the Petition, any exhibits offered, and the public record to determine the claims made, and appropriate relief. (See ROLAN v. VAUGHN; STATE v. RUNNINGEAGLE; TAYLOR v. MADDOX; US v. BARNES; WILLIAMS v. TAYLOR.)
                    Exhibit Pub. Rec.


   Harmless Error

[P.130]   Before a federal constitutional error may be held harmless, "the
court must be able to declare a belief that it was harmless beyond a reason-
able doubt." Also, if a 6th Amendment violation pervades the entire proceed-
ing, harmless error analysis is anapplicable and the violation is enough to
overturn a conviction.  Nor can a court find harmless error unless it is
convinced that tainted evidence has no impact.  Though not limited to the
example below; the defendant's illegal statement which violated Miranda Rights
could clearly have an impact at trial.  Thus it would not be considered to
be harmless error.  (See CHAPMAN v. CALIFORNIA; SATTERWHITE v. TEXAS; STATE v.
HART; STATE v. IVES; STATE v. SHING; STATE v. WOOD; US v. LUJANO-PEREZ; US v.
MACKINS; and US v. WILLIAMS.)                              Exhibit Pub. Rec.


          Indictments


[P.131] The accused is entitled to due process during grand jury proceedings.
An enhanced indictment is forbidden, even in the absence of proof of actual
retalitory motivation on the part of the prosecutor.  A multiplicitous indict-
ment violates the Double Jeopardy clause because it raises danger that the
defendant will receive more than 1 sentence for a single crime.  And an in-
dictment charging 3 counts for 3 seperate transactions was multiplicitous
when the 'statute' punishes continuing conduct rather than separate offenses,
as in the case before this honorable court.  (See CRIMMINS v. SUPERIOR COURT;
STATE v. NORIEGA; US v. BRANDON; US v. GRAHAM; US v. LEFTENANT; US v. OVER-
TON.)                                            Exhibit A.1 of 1


[P.132] In the case of STATE v. FORD, the defendant was arrested and tried
under Class-X offense of Predatory Criminal Sexual Assault, and Aggravated
Criminal Sexual Abuse for acts allegedly committed on a boy who was under
the age of 13.  Bond was set at $75,000; and penalties ranging from 6 to 30
years in prison.  (See ILLINOIS v. CHRISTIAN M. FORD;  2014-CF-450; also,
Champaign Man Charged With Molesting Neighbor Boy, by Mary Schenk, April 11,
2014, https://news-gazette.newsbank.com/doc/news/14E393F38D418A18?search ...)

                                                 Exhibit D.1 of 1
[P.133] In the Court of Christian M. Ford, wherein the Circuit Court of Cham-
paign County, IL.  The defendant (as the Petitioner in this case), was arrested
and tried under Class-X offense of Predatory Criminal Sexual Assault.  Where
in the court of Ford, the presiding Judge, Heidi N. Ladd, and when issues

and defenses were raised by trial counsel; the Court, the Prosecutor, and the Trial Counsel, were all in agreement that the sentencing statute, or charging instrument charged against Ford was Unconstitutional. (See STATE OF ILLI-NOIS v. FORD, 2014-CF-450.)

[P.134] In the court of Champaign, Illinois, upon agreement, decided that Christian M. Ford be removed from the Class-X offense of Predatory Criminal Sexual Assault, and the Stated AMENDED or CHANGED the charges to a Class-2 offense of Aggravated Criminal Sexual Abuse; being probational as an offense. To which defense had moved to accept the State's offering of the Class-2 count. In order to retry defendant under a statute which was Constitutional, because circuit court ruled against the Class-x charge as Unconstitutional, and could NOT be used to try Christian M. Ford therein. (See FORD, 14CF450.)

[P.135] Christian M. Ford later failed to comply with the terms of his probation and ended up being sentenced to 6 years in the Illinois Department of Corrections. He tried to appeal the decision, and lost in the Appellate Court. (See PEOPLE v. FORD, 2019 Ill. App. 4th 160715 [under S.C. Rule 23 (e)(1).]; "Champaign man charged with molesting boy" by Mary Schenk [mschenk @news-gazzette.com] April 11, 2014, news-gazzette.newsbank.com; "Probation missteps lead to 6-year prison sentence" by Mary Schenk, August 19, 2016, news-gazzette.newsbank.com] list not exhaustive...)    Exhibit E.1 - 3
                                                                Exhibit F.1 - 7

                    Ineffective Assistance of Counsel

[P.136] Ineffective Assistance of Counsel may be demonstrated where counsel performs competently in some respects but not in others. As in the case herein, defendant was accused of molesting a child and the evidence was such that the case would turn on accepting one party's word over the other. The defende counsel to, at a minimum, need to consult with an expert... This was not done. (See EZE v. SENKOWSKI.)

[P.137] A court is permitted to analyze prejudice from the totality of counsel's errors. (See MAK v. BLODGETT.)

[P.138] A conflict of interest arises when counsel's "loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another

client or a third person or by his own interest." In this case before the
court, it was the defendant's wife who hired Philip R. Nathe to represent
the defendant in court. She hired him, paid him, and signed the contract
with him. Counsel seemed to be more interested in protecting the interests
of the wife (at the time), than those of the defendant. Of coure the wife
would be interested in protecting the victim, who was her daughter. This
situation created a 'conflict of interest' when representing the defendant.
Which may have been one of the reasons for counsel to only push plea bargins.
(See PEOPLE v. HORTON; People v. Spreitzer, 123 Ill.2d 1, Exhibit Pub. Rec.
18(1988); Hudson, 195 Ill.2d at 123; Thomas, 131 Ill.2d at 110-11)

[P.139] When evaluating counsel's performance, an "uninformed strategy" is
"No strategy at all." Defendant's counsel did not seem interested in invest-
igating or challenging evidence. He wasn't interested in hiring experts, or
filing a lot of Motions. It appeared he was looking for the least amount of
time for as little work as possible. (See CORRELL v. RYAN.)

[P.140] Counsel did not seem interested investigating lack of medical evi-
dence or call medical expert to advise him. (See HOLSOMBACK v. WHITE; JONES
v. RYAN; LINDSTADT v. KEANE; and PAVEL v. HOLLINS.)         Exhibit Pub. Rec.

[P.141] Counsel's failure to challenge counts against defendant as multipli-
citous was ineffective assistance because not based on reasoned tactical
decision, as in the case here in. (See US v. WEATHERS.)     Exhibit Pub. Rec.

[P.142] Petitioner's right to due process was violated by his counsel's fail-
ure to tentitively investigate the state's physical evidence, DNA, or other
medical reports. And to thoroughly challenge the evidence through Motions
guaranteeing defendant's rights under the 6th and 14 Amendments of the U.S.
Constitution. (See PEOPLE v. PARKER, 288 Ill. App. 3d 417, 421, 223 Ill.
Dec. 772, 680 N.E.2d 505 (1997); PEOPLE v. MELCHI, No. 2016-CF-260 (2026).)

[P.143] Counsel failed to file a "Frank's Hearing" for the defendant, for
the court to determine if custodial interrogation was done according to the
law, and Due Process safeguards therein. Where, IAC Claim is appropriate
because, it is not trial strategy to forget to schedule Motions in which
hearing - is to determine if the "confession" submitted by the police was
in fact, admissable, and legally obtained under the law, and Due Process

of the 4th, 5th, 6th, and 14th Amendment U.S.C. rights, and under Art. I §
6th, 7th, and 8th of the Illinois State Constitution.          Exhibit Pub. Rec.

[P.144] Counsel's deficient performance, left defendant basically without a
viable defense, where compentancey is lacking, and no added measure is given
to the initial presentation, preparation, or representation of his client.
Where vital mistakes such as failing to Motion the court for hearings; or a
Motion to Subpoena material evidence, or filing a Motion to supress certain
evidence, in which police provided to the prosecutor for the purpose of pro-
secuting the accused.  And defense counsel's failure to provide competent
performance, prejudiced the defendant.  (See U.S.C.A. 5th, 6th, & 14th.)

[P.145] Ineffedtive Assistance of Counsel:  Unconscientious, and unmeaningful
representation wherein accused is adversely prejudiced by deficient perform-
ance by his attorney.  And his failing to Motion the court to supress his
illegally obtained confession, violating the decision of MIRANDA v. ARIZONA.
Failing to Motion the court to mention the Miranda rights violation which
occurred while defendant was in pre-trial detention, and/or a custodial inter-
rogation.  (See U.S.C.A.5th, 6th, & 14th.  IAC for not enforcing defendant's
right to Equal Protection of the law.)                        Exhibit Pub. Rec.

[P.146] Counselor's deficient performance caused grave prejudice to the de-
fendant during the pre-trial investigative phase.  Did not utilize sound
judgement in preparing or representing the case before the court herein.
Such deficient performance allowed the State to estrappulate too many charges
for single victim - single course of action or conduct.  And therefore it was
impermissive for the state to charge each count as if a distinctly difference
so as to charge these charges under Illinois Supreme Court Rules, and Ill-
inois Constitution Art. I § 6th, 7th, and 8th.  Conduct within a single set-
ting is CONCURRENT.  The State never fully established any physical, or doc-
tor's testimonial/professional evidence on State's case, and its evidence.

[P.147] Petitioner states that he received ineffedtive assistance of counsel.
Where, under the Ineffective Assistance of Counsel Act; PSR findings may be
admitted as accurate if the defendant in this case, had an opportunity, or
his attorney fails to object to those reports, or their accuracy, at the time
of sentencing.  (See US. v. SCRIVNER, 114 F.3d 964 (9th Cir 1997.)

[P.148] In the petitioner's case, his counsel repeatedly advised him to take a plea deal instead of pursuing trial like he wanted - especially since counsel told him the state did not really have any solid evidence. Petitioner got the impression that counsel quit trying since money ran out. At that point, it appeared counsel resorted to coersion and intimidations to induce him to accept plea deal. (See MACHIBRODA v. US, 368 U.S. 487, 7 L.Ed.2d 473, 82 S.Ct. 510 (1962).)

[P.149] Where the poor preparation of defendant's counsel caused prejudice. The Petitioner alleges that his attorney pressured him into pleading guilty at the plea hearing in order to "hide his lack of preparation" for trial. Petitioner states that his counsel did not even make "minimum" efforts to "act as Petitioner's counsel." The attorney acted as an advocate for the state by only being interested in presenting the State's plea offers. (See US v. SANCHEZ-BARRETO, 93 F.3d 17 (CA 1 1996). Defendant plead guilty after being coerced by his attorney.

Miranda Rights

[P.150] At the request of defense, the trial judge must conduct a pre-trial hearing to determine if the defendant's confession was voluntary. And this would effect his guilty plea under U.S.C.A. 5th, and 14th. (See SIMS v. GEORGIA, 385 U.S. 538 44, 87 S.Ct. 639, 17 L.E.2d 593 (1967).

[P.151] The state cannot change its theory, under PENA v. COLORADO, Docket# 15-606, 580 U.S. 137 S.Ct. 855, 197 L.Ed.2d 107. Whereby violating Defendant's right to remain silent, or to envoke his 5th Amendment right to remain silent before police. And Defendant's rights under Miranda were violated by law enforcement and prosecutor. (See Motion filed concerning Mirand Rights violation in PEOPLE v. PETERSON, 11CF69 - Common Law Record, that was never acted upon by counsel.)

[P.152] An accused having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police. Not once, but 3 separate times, did the defendant in the case herein tell police that he did not want to make a statement, and wanted counsel to be present. The

police simply ignored the defendant's request. After waiting for a brief period of time, they resumed questioning, and was constantly coersing me to make a statement. This went on for hours, perhaps 5 to 8 or more hours. (See EDWARDS v. ARIZONA, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981.)
                                                                    Exhibit Pub. Rec.


[P.153] **Miranda** warnings must be given when a suspect is both in custody and about to be subject to interrogation. The court in the case of PERKINS rea- soned that custody and interrogation "may create mutually reinforcing pres- sures" that can overcome the suspect's will, as in the case here before this honorable court. I was at the police station for hours on end and did not feel I was free to leave. The whole time, they were interrogating me with questions despite my protests and several requests for an attorney. (See ILLINOIS v. PERKINS, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); MIRANDA v. ARIZONA, 384 U.S. 436; PHILLIPS v. STATE, 285 Ga. 213; RHODE ISLAND v. INNIS, 446 U.S. 291; STATE v. EDWARDS, 325 Conn. 97.)
                                                                    Exhibit Pub. Rec.

          Plea Agreements

[P.154] The Sixth Amendment violation in the Petitioner's case herein caused the entire plea negotiation process between the defendant and the prosecution to be conducted based on an erroneous sentencing calculation, weighed against the defendant in this case. As a result, he is entitled to be returned to the at pre-plea state, and to have his rights protected under the correctly calc- ulated sentencing range, and/or sentencing instrument, in accordance to the Illinois Constitution provisions under Art. I § 6th and 13th. That being both the Due Process, and One Crime-One Act provision. Also, the Equal pro- tections of Illinois Law and its sentencing guidelines, and the Equal Protect- ions of the Constitution against Double Jeopardy. Being sentenced to, or under a sentence being in violation of the Illinois Constitution, Art. I § 6th and 13th. (See LAFLER, 132 S.Ct. 1389)


[P.155] In this Petitioner's case, there had been erronious misapplication of sentencing guidelines. Where Defendant's Counsel failed to advise Defend- ant, and provide a reasonable assessment of facts and the law. (MOORE v. BRYANT, 348 F.3d 238 (CA 7 2003).) Where, as apposed to the normal standard of practice under Srickland, being a standard of effectiveness measured to

the level of effectiveness received by the Defendant herein. A reasonably competent counsel will attempt to learn all the facts of the case. This includes the Probation Department's Pre-Investigation and Pre-sentence Reports, being for the purpose of Due Process to the Defendant. Under U.S.C.A 6th and 14th. As well, any competent counsel would have made an estimate of likely sentence, and communicate the results of that analysis before allowing his client to plead guilty. (See US v. BARNES, F.3d 934, 939 (7th Cir. 1996).) When counsel fails to do so, that failure causes prejudice to the Defendant. Defendant may then withdraw his plea. Therefore, the court agreed with the District Court, that the court's rejection of the Petitioner's claim of In-effective Assistance of Counsel was contrary to, or an unreasonable applica-tion clearly established Supreme Court law. Writ should be granted in this particular case, being there had been a judgment made based upon a misappli-cation of State and/or Federal Sentencing Guidelines, having been applied against the Defendant in this case here before this Honorable Court. (See also Bell v. State, 294 Ga. 5; JONES v. US, 167 F.3d 1142; LEE v. US, 582 U.S. ____; and MABRY v. JOHNSON, 467 U.S. 504.)

        Sentencing

[P.156] It was error for the court to treat the multiple counts against the Defendant as a base level 1 to enhance seperately those criminal indictable offenses as, "distinctly different," or "remotely seperate" acts, in viola-tion to Illinois "One Crime, One Act" under § 6th and 13th of the Due Process Clause of the Illinois Constitution. Also violating the Defendant's U.S.C.A. 14th right to Equal Protections. The court imposed a sentence in error be-cause the Defendant's case involved "the same victim and same act or trans-mission." (US v. CHISCILLY, 30 F.3d 1144 (9th Cir. 1994); STATE v. BRUEGGER, 773 N.W2d 862; STATE v. CANION, 199 Ariz. 227; STATE v. COX, 201 Ariz. 464.)

                                                    Exhibit A.1 of 1

[P.157] The court in this case, wishing to depart above top level of Criminal History Catergory VI should still stay within guidelines by considering sen-tencing ranges for higher base levels. Court cannot creat "suggested" Cat-ergories VII and above extrapolated from criminal history levels. I-VI. (See US v. PENNINGTON, 9 F.3d 1116 (5th Cir 1993).) Ex-post facto clause prohibits use of a guideline in effect at time of sentencing if its use pro-duces harsher sentence than guideline in effect when crime was committed.

(See US v. LeCOMPTE, 99 F.3d 274 (8th Cir. 1996).)

[P.158] The court's reliance on some type of inaccurate or unreliable infor-
mation that may provise a basis for the appeal of the Petitioner's Sentense,
which was imposed on a basis of inaccurate information concerning Defendant's
prior criminal behavior was for resentencing. (US v. TABORES, 86 F.3d 3261
(3rg Cir. 1996). Where Pre-Sentencing Investigation. (Under Fed.R.of Crim.
P. 32.) Which is designed to help judges determine a Defendant's sentence.

[P.158] The Petitioner states that the Circuit Court committed Plain Error
under **Booker,** by enhancing his sentence based on judicial fact finding. The
finding in question that the Petitioner had care and custody over the victim.
Which the court, in its analysis imposed a stiffer penalty upon the Defendant,
which resulted in a two-level increase (from Class-2 to Class-X) in the De-
fendant's offense level, and the state's increased criminal offenses against
the accused led to the state using different sentencing guidelines. In add-
ition, the state used this to move from concurrent to consecutive sentencing
guidelines as well. Where the standard of proof for sentencing guidelines
would require the court to first, conclusively weigh in all factors involved
in the case before the court. Part of this determination would come from the
Probation Officer's PSI/PSR reports, in helping to guide the sentencing judge's
base level for sentencing the defendant. In accordance U.S.C.A. 5th, 6th, and
14th rights to Due Process, also found in the Illinois Constitution Art. I
§ 6th, 8th, and 13th. (See original Indictment.)

[P.159] It was improper under the Illinois Constitution, according to the
Due Process and Confrontation Clause, for the Defendant to be charged with
the same Class-X felonies which stemmed from one alleged victim, out of one
said series of actions. The Defendant was originally held on a single Class-
2 offense, which likely may have been proper. Later, 3 much more serious
(Class-X) charges were added based on the same conduct of the lesser charge.
The evidence had never conclusively determined that the Defendant, being
indicted or arrested by the use of such information which was ingrafted into
the state's theory of how the events took place, and/or unfolded. Illinois
Constitution Art. I § 6th, 7th, and 8th, Confrontation Clause allows the
Defendant his right to confront his accusers, and to cross-examine them, to
determine authenticity of the state's key witness's testimony as material

evidence, central to prosecuting the state's case.

[P.160] As in cases similar to PEOPLE v. PETERSON (11CF69), other similarly situated cases (See PEOPLE v. FORD (14CF450); PEOPLE v. HUGES, 2015 IL 117242; PEOPLE v. DODDS, 2014 IL (1st) 122268/1CR02556; PEOPLE v. McINTOSH, 2017 IL App. (4th) 160722-U; PEOPLE v. STOKES, 689 N.E.2d 625 (1997); DOMINGUEZ v. HENDLEY, 545 F.3d 585 (2008); and YOUNGBLOOD v. ARIZONA, (cit. omitted).) In all of these cases, DNA evidence was of inquest in order to prosecute its case under a theory which required DNA evidence to meet its burden. But in the People's case against the Defendant herein, the State opted out of providing any physical evidence required by Supreme Court to prove its case herein. So, evidence of sustained injury, or great bodily harm, or sexual (repeated) contact was absent of the record for conviction herein.

Misc.

[P.161] In the case herein of the Defendant, there had been an enhancement sought, under the state's theory that the Defendant had been sexually abusing his daughter for "several" (void for vagueness) years. The state, under its theory, intended to prove its case under the burden of production. However, that quest or mission to obtain such evidence from a doctor showing proof of longstanding (physical) abuse, and yet the state under its burden failed to show or provide such physical/scientific DNA/forensic evidence for trial. The state failed to meet its burden under its own theory. In addition, the Court's Sentencing Order only lists 1-22-2011 as the Date of Offense for all 3 Charges, which appear to contradict or preclude the state's theory of "several" (void for vagueness) years. So which is it? 1-22-2011, or "several years"? It can't be both.                      Exhibit B.1 of 2

[P.162] The Illinois Supreme Court (2021) has decided that when the state constructs its case under a specific theory as to events, occurrances, and defendant's guilt; and when the Defendant attacks the constitutionality of his conviction in an appeal, the state may not change its theory it used to prosecute its case and secure its conviction. The prosecution may not elect, or change that theory during the appeal of that conviction.

Vindictive Prosecution

[P.163] Since Counts II, III, and IV more severe, and based on the same con-
duct as the original charge, prosecution could be accused of potential vin-
dictive prosecution. (See US v. SUAREZ, 263 F.3d 468, 480.) Exhibit Pub. Rec.

[P.164] A presumption of vindictiveness when prosecutor brought charge carrying
potentially greater sentence than original charge because circumstances demon-
strated either actual vindictiveness or realistic fear of vindictiveness.
The original charge was only a Class-2 offence which carried 50%. Then based
on the same information, prosecution added three Class-X offenses which not
only carry 85%, it also allows charges to be ran consecutively, instead of
concurrently. Not only did prosecution raise the charges by a factor of 2,
it was multiplied by 3 as well. (See US v. TAYLOR, 749 F.2d 1511, 1513 (11th
Cir. 1985).) (See original Indictment/Grand Jury Transcripts.)

[P.165] One may wonder if there is systemic vindictive prosecution when even
under a new state's attorney, there is a tendency to want to make charges
more serious than needed. For example, in the state's recent "Motion To
Dismiss Post-Conviction Petition," the state's attorney in number 10 of the
Motion, said: "a. Class X felony, 6-60 years in prison. 720 ILCS 5/12-14.1
(b)(1)." There are 2 serious issues with this. First, the Defendant was
sentenced under 720 ILCS 5/12-14.1 (a)(1), not (b)(1), which would require
a weapon such as a firearm when none was present. Also the sentencing range
is in error since in 2011, it was 6-30 years, not 6-60 years as it is now.
All of these various factors seems to point to a system of "Punitive Justice"
rather than the "Restorative Justice" that seems to be the true goal of soc-
iaty. All of us ought to be working together towards the goals of diversity,
equity, and inclusion.                                      (See Motion.)

## CONCLUSION

[P.166] Wherefore, the Petitioner, Timothy L. Peterson, respectfully requests
that this most Honorable Court in its consideration of the Petitioner's Motion:
1) That based in light of the arguements presented, this Court's findings
concerning the current 3 charges of Preditory Criminal Sexual Assault under
720 ILCS 5/12-14.1(a)(1), determine that these charges are either unconsti-
tutional and/or inappropriate in this case; and 2) That the charge(s) shall

38

all be vacated with prejudice (counts 1-4). That no further requirements are made of me (in that I do not face parole, MSR, sex offender registration, etc.). And that this Honorable Court gives the Orders for my immediate release from the Illinois Department of Corrections. May this Honorable Court in reviewing the facts presented in this Petition agree that his Constitutional Rights were violated, which caused prejudice to the Petitioner. This resulted in an unfair criminal proceeding, due to the aforementioned violations cited in the Petitioner's 5/122-1 thorugh 122-8 Petition for Post-Conviction Relief. As previously mentioned, I humbly request that this Honorable Court Vacates with Prejudice the Petitioner's Sentence and awards him his freedom. I have been incarcerated for about twelve (12) years, and tried to use my time wisely to get rehabilitaed as best as possible. I did not want to leave prison the same man that went in. I entered programs, got counseling, stayed involved in religious activites, wrote books, read self-help, and even did artwork and wrote poems. I have parents in Indiana who are willing to support me until I can get back on my feet. Plus my arrest record and public records on the internet will serve as a continual reminder while in society. I am in no way, getting out without punishment or without handicaps. My past activity will still likely continue to bar me from some areas even without having to register. One of my goals is to tell others what I have learned, and not to go down this path. It is simply not worth it. The best policy is to save sex for marriage.

[P.167] I, Timothy L. Peterson, Petitioner, pro se, declare under penalty of perjury that all assertions made in this Petition are complete, truthful, and accurate to the best of my knowledge.

Dated: 1 / 26 /2023

/S/

Timothy L. Peterson, Petitioner, pro se
IDOC#: M22384
Shawnee Correctional Center
6665 State Route 146 East
Vienna, IL 62995

F I L E D

JUL 8 2011

~~Joseph W. Foley~~
LA SALLE COUNTY CIRCUIT CLERK
THIRTEENTH JUDICIAL CIRCUIT OF ILLINOIS

IN THE CIRCUIT COURT OF LA SALLE COUNTY, ILLINOIS
13TH JUDICIAL CIRCUIT

Date of Sentence: 07-08-2011
Date of Birth: 02-01-1974
Year of Birth: 1999
(victim)

PEOPLE OF THE STATE OF ILLINOIS )

vs )  Case No. 2011-CF-69

11-CF-69
Exhibit A.1 of 1

Timothy Peterson
Defendant

**JUDGMENT – SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS**

WHEREAS the above-names defendant has been adjudged guilty of the offenses enumerated below.

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| II | Predatory Criminal Sexual Assault of a Child | 01-22-2011 | 720 ILCS 5/12-14.1(a)(1) | Class X | 7 Yrs. 0 Mos. | 3 Yrs. To Natural Life |

and said sentence shall run (☐concurrent with) (☒consecutive to) the sentence imposed on:

| III | Predatory Criminal Sexual Assault of a Child | 01-22-2011 | 720 ILCS 5/12-14.1(a)(1) | Class X | 7 Yrs. 0 Mos. | 3 Yrs. To Natural Life |

and said sentence shall run (☐concurrent with) (☒consecutive to) the sentence imposed on:

| IV | Predatory Criminal Sexual Assault of a Child | 01-22-2011 | 720 ILCS 5/12-14.1(a)(1) | Class X | 7 Yrs. 0 Mos. | 3 Yrs. To Natural Life |

The Court finds that the defendant is:

☐  Eligible for and is sentenced to an extended term pursuant to 730 ILCS 5/5-8.2

☐  Convicted of a class ____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☒  The Court further finds that the defendant is entitled to receive credit for time actually served in custody from February 5, 2011, through present date of July 8, 2011, for a total of 154 days as the date of this order.

☐  The Court further finds that the conduct leading to conviction for the offenses enumerated in count(s) ____ resulted in great bodily harm to the victim. (730 ILCS 5/3-6-3(a)(2)(iii) ).

☐  The Court further finds that the defendant meets the eligibility requirements and is approved for placement in the impact incarceration program. If the Department accepts the defendant and determines that the defendant has successfully completed the program, the sentence shall be reduced to time considered served upon certification to the Court by the Department that the defendant has successfully completed the program. Written consent is attached.

☐  The Court further finds that the offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance.

☐  IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) be (☐concurrent with) (☐ consecutive to) the sentence imposed in case number ____ in the Circuit Court of ____.

☒  IT IS FURTHER ORDERED that the defendant serve ☐ 75% ☒ 85% ☐ 100% of said sentence.
☒  IT IS FURTHER ORDERED that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

☒  IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise release by operation of law.

☒  IT IS FURTHER ORDERED that Count I be dismissed pursuant to plea.

This order is (☒ effective immediately) (☐ stayed until ____ ).

Date: 7/8/11          Enter:  _____

_____
CYNTHIA M. RACCUGLIA
(PLEASE PRINT JUDGE'S NAME HERE)

FAX 1 815 434 8857          LASALLE CO STATES ATTY                    ☒006

| STATE OF ILLINOIS | ) | | IN THE CIRCUIT COURT THEREOF |
|---|---|---|---|
| | ) | SS. | |
| COUNTY OF LASALLE | ) | | GENERAL DIVISION     11-CF-69 |

Exhibit B.1 of 2

PEOPLE OF THE STATE OF ILLINOIS )
                    Plaintiff,    )
            vs.                   )          No. 2011-CF-69
Timothy Peterson                 )
                    Defendant.    )

## STATE'S ATTORNEY'S STATEMENT

**FILED**

**AUG 05 2011**

LA SALLE COUNTY CIRCUIT CLERK
THIRTEENTH JUDICIAL CIRCUIT OF ILLINOIS

Defendant's Name: Timothy Peterson

Defendant's Address: 213 E. Brown St, Earlville, Il

Date of Birth: 02-01-74

Aliases:

| Offense | No. | Sentence | Date Sentenced | Date Arrested |
|---|---|---|---|---|
| Predatory Criminal Sexual Assault of a Child (Class X Felony) 720 ILCS 5/12-14.1(a)(1) | II | 7 years | 07-08-2011 | 02-05-2011 |
| Predatory Criminal Sexual Assault of a Child (Class X Felony) 720 ILCS 5/12-14.1(a)(1) | III | 7 eyras | 07-08-2011 | 02-05-11 |
| Predatory Criminal Sexual Assault of a Child (Class X Felony) 720 ILCS 5/12-14.1(a)(1) | IV | 7 years | 07-08-2011 | 02-05-201 |

TIME IN CUSTODY: 154 days

ABOVE SENTENCES ARE: Consecutive

Judge: ☒ Cynthia M. Raccuglia   ☐ H. Chris Ryan, Jr.

Defense Counsel: Philip R. Nathe

Codefendant:

Disposition:

FACTS AND CIRCUMSTANCES OF OFFENSE:
In early February, 2011, officers began an investigation into the defendant for sexually molesting his daughter for the last several years. His daughter, who is now eleven, stated that her father has been "putting his thing in her thing" for several years now, almost once a week. She stated when he does this, he moves up and down and then "catches white stuff in his hand". She also stated he also fondles her vagina with his fingers and puts his fingers in her vagina. She stated he also puts his penis in her mouth. The defendant was interviewed and admitted to doing inappropriate sexual things with his daughter.

15: 27 0808 2011

FAX 1 815 434 8257          LASALLE CO STATES ATTY                          ☑007

11-CF-69
Exhibit B.2 of 2

FACTUAL INFORMATION ABOUT DEFENDANT:
The defendant, Timothy Peterson, is a 37 year old white male with no known physical disabilities. His
criminal history includes a forgery charge. This is the defendant's first Illinois Department of Corrections
incarceration. No security recommendation is being made at this time.

Respectfully Submitted,

BRIAN J. TOWNE
LaSalle County State's Attorney

BJT:sae
Date: August 4, 2011

11-CF-69
Exhibit C.1 of 1

# STATE OF ILLINOIS

## THIRD DISTRICT APPELLATE COURT



**GIST FLESHMAN**
Clerk of the Court
815 434-5050

1004 Columbus Street
Ottawa, Illinois 61350
TDD 815 434-5068

12/02/11

Mr. Peter A. Carusona, Deputy Defender
Office of the State Appellate Defender
1100 Columbus Street
Ottawa, IL 61350

**RECEIVED**

**DEC 0 2 2011**

Office of the State Appellate Defender
*THIRD DISTRICT*
OTTAWA, ILLINOIS

RE:  General No.  3-11-0632
Circuit Court No.  11CF69
County of  LaSalle
People v. Peterson, Timothy

The Court has this day entered in the above entitled cause the

following order:

Motion of Appellant for Remand to Circuit Court
For Compliance With Rule 604(d) Respecting the
Appointment of Counsel is ALLOWED.

GIST FLESHMAN, Clerk
Appellate Court
Third District

cc: Mr. Terry A. Mertel, Deputy Director
Mr. Brian Towne, State's Attorney
Mr. Joseph Carey, Circuit Clerk
Hon. Cynthia Raccuglia, Trial Judge

# Champaign man charged with molesting neighbor boy

*By MARY SCHENK mschenk@news-gazette.com   April 11, 2014   Publication: News-Gazette, The (Champaign-Urbana, IL)   Page: B-3   Word Count: 181*

CHAMPAIGN — A Champaign man accused of sexually molesting a boy in that city was arrested Wednesday.

Christian Ford, 26, who listed an address in the 1200 block of Parkland Court, was charged in a warrant issued Tuesday with predatory criminal sexual assault and aggravated criminal sexual abuse for acts he allegedly committed with a neighbor boy around the first of the year.

Champaign police Sgt. Dave Griffet said the victim, who is under 13, told his mother of the contact when it happened. She did not immediately report it to authorities as she tried to corroborate what her son had told her, Griffet said.

After she did tell the Department of Children and Family Services, Champaign police were asked to investigate.

Griffet said the alleged sex abuse is believed to have happened only one time.

Police searched Ford«s residence on Wednesday while he was away. When he returned later, he was arrested.

Bond on the warrant was set earlier at $75,000. Predatory criminal sexual assault of a child is a Class X felony carrying penalties ranging from six to 30 years in prison upon conviction.

News-Gazette, The (Champaign-Urbana, IL)

https://www.news-gazette.com/news/probation-missteps-lead-to-6-year-prison-sentence/article_e9abc891-21aa-540b-b322-895911790bef.html

# Probation missteps lead to 6-year prison sentence

*By Mary Schenk mschenk@news-gazette.com*

Aug 19, 2016



URBANA — A former Champaign man who a judge said totally failed at his probation for sexually molesting a young boy was resentenced Friday to six years in prison.

"He walked out of this courtroom as if unfettered by his prior ... tragic ..." Judge Heidi Ladd said of Christian Ford.



We are selling off our remaining magic metal windmills. Great garden decor.

1  Click Contin
2  Add app
3  Access Popul

In December, Ford, 29, then living on Parkland Court, pleaded guilty to aggravated criminal sexual abuse. He admitted that in January 2014, he put his hand on the sex organ of a young boy for whom he was babysitting in Champaign.

11-CF-69
Exhibit E.2 of 3

After receiving Ford's sex offender evaluation in April, Ladd went along with the agreement that Ford should serve 30 months of probation, 160 days in jail and register as a sex offender.

Other rules of probation were that he report regularly to a probation officer, notify authorities of any change of address, and get medical testing for sexually transmitted diseases.

In June, however, the state took steps to revoke Ford's probation when a probation officer reported that he had not followed any of those rules.

"He completely blew off his probation obligations," said Assistant State's Attorney Matt Banach, who recommended a seven-year sentence.

Ford's attorney, Assistant Public Defender Janie Miller-Jones, said Ford, who most recently lived in Madison County, has been getting help through group meetings for substance abusers in the county jail. She said he also has the support of family and a fiance. She asked the judge to give him another chance at probation so he could continue to address his substance abuse problems.

Ford apologized to the judge and the attorneys and said he "clearly lost focus" when he was let out of jail earli

offenders and

**We are selling off our remaining magic metal windmills. Great garden decor.**



1. Click Contin
2. Add app
3. Access Popul

7/21/22, 3:19 PM          Probation missteps lead to 6-year prison sentence | News | news-gazette.com

Recounting Ford's four prior misdemeanor and three felony convictions, Ladd said he had ample opportunities in the past to get help, including a sentence to drug court in another county.

Exhibit E.3 of 3
11-CF-69

Ladd said Ford presented a danger to the public when, as a sex offender, "he went off the grid" by failing to report his current address to authorities or even show up to appointments with a probation officer.

Ford was given credit on his sentence for 210 days already served.

**Mary Schenk**
Reporter

*Mary Schenk is a reporter covering police, courts and breaking news at The News-Gazette. Her email is mschenk@news-gazette.com, and you can follow her on Twitter (@schenk).*

## Trending Videos

---

**We are selling off our remaining magic metal windmills. Great garden decor.**

⌗ Click Contin

⌗ Add app

⌗ Access Popul



〈 CONTINUE 〉

https://www.news-gazette.com/news/probation-missteps-lead-to-6-year-prison-sentence/article_eda4c400-0322-8959-179bbabf.html      3/6

No. 4-16-0715
APPELLATE COURT OF ILLINOIS FOURTH DISTRICT

# People v. Ford

2019 Ill. App. 4th 160715
Decided Jan 7, 2019

No. 4-16-0715

01-07-2019

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTIAN M. FORD, Defendant-Appellant.

JUSTICE KNECHT delivered the judgment of the court.

## NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

Appeal from the Circuit Court of Champaign County
No. 14CF450

Honorable Heidi N. Ladd, Judge Presiding.

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Holder White and Justice Cavanagh concurred in the judgment.

## ORDER

¶ 1 *Held*: The appellate court affirmed, concluding defendant forfeited his contention of error in his sentence by failing to raise it before the trial court.

¶ 2 Defendant, Christian M. Ford, entered a negotiated guilty plea to aggravated criminal sexual abuse and was sentenced to 30 months' probation. Defendant's probation was later revoked due to his failure to comply with its terms and conditions, and the trial court resentenced him to six years' imprisonment. Defendant appeals, arguing the trial court improperly punished him for conduct while on probation rather than resentencing him for the underlying offense. We affirm.

¶ 3 I. BACKGROUND

2    *2

¶ 4 In December 2015, defendant entered a negotiated guilty plea to aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1), (g) (West 2012)), a Class 2 felony. The plea stemmed from a January 2014 incident where defendant, who was then 26 years old, committed an act of sexual conduct with his paramour's son, who was then five years old, by placing his hand on the boy's penis while the boy was under defendant's supervision. In exchange for the plea, the State recommended defendant be sentenced to 160 days' incarceration, with credit for 160 days already served, and 30 months' probation, with certain terms and conditions.

¶ 5 In April 2016, the trial court, after receiving and considering the statutorily required sex offender risk assessment evaluation, sentenced defendant in accordance with the plea agreement.

¶ 6 In June 2016, the State filed a petition to revoke defendant's probation. The State alleged defendant violated the terms and conditions of his probation by failing to (1) report as directed for medical testing on May 31, 2016, or otherwise complete such medical testing (730 ILCS 5/5-5-3(g) (West 2014) (requiring medical testing for

People v. Ford   2019 Ill. App. 4th 160715 (Ill. App. Ct. 2019)

sexually transmissible diseases)); (2) report as directed to the Madison County probation department on June 13, 2016, for courtesy supervision intake; (3) advise his assigned probation officer of a change of residence; and (4) maintain contact with court services.

¶ 7 In July 2016, the trial court held a hearing on the State's petition to revoke defendant's probation. Defendant admitted to the allegations in the State's petition, and the State presented a factual basis to support the admission. The court accepted defendant's admission, finding it to be knowingly and voluntarily made and supported by a factual basis. The court revoked defendant's probation.

3    *3 .

4

¶ 8 On August 19, 2016, the trial court held a resentencing hearing. The court had before it an April 2016 sex offender risk assessment evaluation and a recently created presentence investigation report. The defense presented the court with various exhibits in mitigation, which included (1) documentation indicating defendant had attended Alcoholics Anonymous and Moral Reconation Therapy meetings while incarcerated and (2) letters from defendant's mother, father, fiancée, and former employer.

¶ 9 In issuing its recommendation, the State highlighted defendant had previously been given multiple community-based sentences, all of which proved to be unsuccessful. The State asserted defendant failed to take advantage of an "exceptional opportunity" under the plea agreement in this case and highlighted defendant's conduct while on probation. The State argued, based on defendant's criminal history and his prior unsuccessful community-based sentences, a community-based sentence in this case would not be appropriate. The State recommended defendant be resentenced to seven years' imprisonment.

¶ 10 The defense acknowledged defendant's failure to comply with the terms and conditions of probation but asserted defendant was "trying to do the right thing at this point in time." The defense requested another community-based sentence.

¶ 11 Following recommendations, defendant made a statement in allocution, apologizing for his actions while on probation and requesting a community-based sentence.

¶ 12 The trial court ruled as follows:

"This court has considered the presentence [investigation] report, the sex offender [risk assessment] evaluation, all relevant statutory factors, including but not limited to the nature and

*4

11-CF-69
Exhibit F 2 of 7

circumstances of the offense, the evidence and applicable factors in aggravation and mitigation, the character, history[,] and rehabilitative potential of the defendant, his statement in allocution, the documents tendered in mitigation, and the arguments and recommendations of counsel.

[Defendant] is [29] years of age. He does have a prior history of criminality which started nine years ago. It spans four counties, four misdemeanors[,] and three felonies, including this one. In 2008[,] he received drug court probation for a felony theft, a [c]lass 3 felony theft. He violated that and was subsequently resentenced to the Department of Corrections in 2010. While he was on parole he was convicted of and actually committed the offense of criminal damage to property. In 2013 then he was convicted of theft with a prior theft conviction, given an opportunity for [Treatment Alternatives to Street Crimes (TASC)] probation for [30] months. He was serving that probation when he committed this offense as well as the [driving under the influence charge] that he was convicted of. This offense was committed in January of 2014.

He does have his high school education and one class at a college level. He has been employed since December of 2015 but he does present a significant work history prior to that, multiple

different employments, some in short stints. I believe the longest employment he has held was [14] months but he has been gainfully employed for a large, if not the majority of his adult life, up until December of 2015, so he has the ability to do well. That's not as unusual with this type of an offense, but the court will note that. He has no medical or mental health issues. He does describe alcohol use and an entrenched history of cannabis and cocaine use since he was young. Some periods of sobriety. Those seem to coincide with often when he was incarcerated or under some restrains. He claims he has not used any illegal substances since December of 2015. He has had treatment in the past. In 2012[,] he completed residential treatment. In December of 2015[,] he went to the Pavilion and was transferred then to [the Alcoholic Rehabilitation Community Home], a program out of this county. He was unsuccessfully discharged in April of 2016 for lack of cooperation and dishonesty. He did take advantage or did have the advantages offered to him throughout his trips through the criminal justice system of some extraordinary programs, drug court, TASC and substance abuse counseling, put in place in his most recent conviction for driving under the influence, and he did not start up, even take advantage of that counseling with the last conviction

6

5    *5

*6

11-CF-69
Exhibit F.3 of 7

People v. Ford    2019 Ill. App. 4th 160715 (Ill. App. Ct. 2019)

which was from April of 2016, at the same time he pled in this case.

I want to make it clear that there is no evidence this offense was committed as a result of any use or addiction to an illegal drug. The nature and circumstances of this offense is something the court can consider, and I have reviewed the factual basis. The victim was born in 2008. This happened in 2014[,] so he was very young. Even within the continuum of parameters that describe the age for the offense, he was on the young side of that. It is a factor in aggravation that this defendant was in a supervisory or care taking role for the victim. He was babysitting him for the victim's mother at the time. The victim reported that this defendant touched the victim inside his underwear. The victim told him to stop, and the defendant told him it was okay [and that] the victim's mother said it was okay, and that's what he relayed to the child. The defendant's explanation when he was evaluated by Mr. Kleppin *** as part of the sex offender [risk assessment] evaluation was that he was simply rough housing and playing games and tickling the child. The evaluator, Mr. Kleppin, had some concerns that at times the defendant appeared smug or grandiose, although he was always cooperative and pleasant, and he found him to be a moderate risk for reoffending and set forth very restrictive

7    *7

8

requirements and very clear requirements as to what would be required for this defendant to be safe and successful in a community-based release. The State agreed to a community-based release as part of the original plea.

Once the defendant was released then, he failed to do anything. The probation was transferred to the county of his residence or where he claimed to reside to accommodate him and to meet his needs and make it as easy as possible to be successful, and instead of utilizing that extraordinary opportunity, this defendant blew it off all together. I want to make it clear these weren't just technical violations. [Defendant] walked out of this courtroom as if he was unfettered by any court orders whatsoever.

It is significant to the court that in the [sex offender] risk assessment that was conducted back in April as part of the original plea, the counselor made it clear that part of the recommendations were that this defendant should participate in sex offender therapy, total abstinence from all mood altering chemicals, maintain gainful employment, and cooperate with all the supervising requirements. It was the evaluator's opinion that if the defendant failed to comply with any of these conditions, it should be viewed as noncompliance with an increased risk to relapse and potential for reoffending, and the evaluator expressed concern for the safety of

*8

11-CF-69
Exhibit F.4 of 7

the community, and that's precisely what happened. Despite the fact that probation travelled with this defendant to accommodate his needs, he followed through with none of this. He did not meet the most basic requirements, and that is he did not comply with even testing before he decided to blow off the conditions of probation. He never came in to be tested for sexually transmittable disease[s], to show that he was rehabilitating himself, had remorse for what he had done, and give the victim some assurance as to whether or not he had any type of sexually transmittable disease. He failed to show up all together. Court Services gave him several opportunities to do so, and to this date he has not cooperated with that requirement. He registered for the first move and then left from that address. Gave false information to the Madison County supervisory probation office, and they found out he hadn't lived at that address that he gave them for weeks, and he never notified them of the new address, so at this point he was off the grid. We had a sex offender who was not cooperating, was not getting counseling, was not getting treatment, and nobody knew where he was. Again that's an essential point. It certainly creates a higher risk for the community, and the legislature recognized that by requiring sex offenders to register.

9    *9

10

Deterrence is a factor for the underlying offense and for those who choose to molest children, and also to make it clear that if you're given an opportunity to deal with that in a community-based sentence, it must be taken seriously. And what's the message to others who do work hard to be successful on probation if there are no sanctions for those who do not? What the defendant has demonstrated is that the resources made available to him to change the direction of his life meant nothing. He didn't just miss some appointments or not follow through or get confused; he totally dropped out of sight. He did absolutely nothing. And the bottom line is to have an untreated child molester free in the community whose whereabouts are unknown, who has gotten no counseling, is creating an untenable and unacceptable risk that the public should not be subjected to. He violated the court order. It's apparent he did not take any of this seriously, and he didn't take even the basic steps necessary to take advantage of that opportunity that was put before him.

It's the court's determination, having regard to the nature and circumstances of the offense and to the history, character[,] and rehabilitative potential of the defendant, imprisonment is [a] necessity at this point to protect the public. A community-based sentence would deprecate the seriousness of the defendant's

*10

11-CF-69
Exhibit F.5 of 7

People v. Ford    2019 Ill. App. 4th 160715 (Ill. App. Ct. 2019)

conduct, be inconsistent with the ends of justice, and I find would not be successful again. There's no basis to find that anything has changed from what had happened the first time.

It's the court's determination that the appropriate sentence is a period of incarceration in the Illinois Department of Corrections for six years, followed by two years of mandatory supervised release. He is to receive credit for his time previously served."

¶ 13 On August 22, 2016, defendant filed a motion to reconsider his sentence. In his motion, defendant argued (1) his sentence was "excessive;" (2) the trial court failed to impose a sentence in accordance with the seriousness of the offense and the objective of restoring him to useful citizenship; (3) his sentence was "not in keeping with [his] past history or criminality, mental history, family situation, economic status, education, occupational or personal habits;" and (4) the court failed to "give enough weight to his mitigation evidence and his age and his ability to be rehabilitated."

¶ 14 In September 2016, the trial court held a hearing on defendant's motion to reconsider his sentence. Defendant stood on his written motion. The court denied the motion.

¶ 15 This appeal followed.

## ¶ 16 II. ANALYSIS

¶ 17 On appeal, defendant argues the trial court improperly punished him for conduct while on probation rather than resentencing him for the underlying offense. The State disagrees, maintaining the court properly sentenced defendant on the underlying offense and properly

considered defendant's conduct while on probation when evaluating his rehabilitative potential and the risk he posed to the general public.

¶ 18 To preserve an issue for review on appeal, the record must show (1) a contemporaneous objection to the trial court's error was timely made and (2) the issue was contained in a written posttrial motion. *People v. Rathbone,* 345 Ill. App. 3d 305, 309, 802 N.E.2d 333, 336 (2003). At no point in the proceedings below did defendant suggest the trial court improperly punished him for conduct while on probation rather than resentencing him for the underlying offense. Defendant's failure to raise the issue below results in its forfeiture. See *Id.* at 310-11.

¶ 19 Forfeiture aside, we are not persuaded the trial court's comments during the resentencing hearing shows it intended to penalize defendant for his conduct while on probation rather than his conduct from the underlying offense. "When a sentence of probation has been revoked, the trial court may impose any other sentence that was available *** at the time of the initial sentencing." (Internal quotation marks omitted.) *People v. Somers*, 2012 IL App (4th) 110180, ¶ 21, 970 N.E.2d 606; see also 730 ILCS 5/5-6-4(e) (West 2012). The court may consider the defendant's conduct while on probation in reassessing his rehabilitative potential; however, the sentence imposed must not be punishment for the probation violation. *People v. Risley*, 359 Ill. App. 3d 918, 920, 834 N.E.2d 981, 983 (2005). "A sentence within the statutory range for the offense will not be disturbed as an abuse of the sentencing court's discretion unless this court is strongly persuaded that the sentencing judge intended to penalize the defendant for violating his probation." *Id.* at 920-21. A trial court's remarks "must be taken in context, and read in their entirety, including arguments of counsel." *People v. Young*, 138 Ill. App. 3d 130,

142, 485 N.E.2d 443, 450 (1985).

¶ 20 Defendant was convicted of a Class 2 felony (720 ILCS 5/11-1.60(c)(1), (g) (West 2012)) and faced a possible prison sentence between three and seven years (730 ILCS 5/5-4.5-35(a) (West 2012)). The trial court sentenced defendant to a term within the statutory range, which was one year less than the term the State requested. The court indicated it considered the statutory factors in aggravation and mitigation in reaching its decision. The court specifically addressed the nature and circumstances of the underlying offense as well as defendant's age, health, education, employment history, substance abuse, and criminal record. *C.f. People v. Varghese*, 391 Ill. App. 3d 866, 877, 909 N.E.2d 939, 949 (2009) (remanding for resentencing where the trial court never expressly considered the underlying offense when fashioning its sentence). In considering defendant's request for another community-based sentence, the court commented on defendant's history of unsuccessful community-based sentences as well as his conduct while on probation in this case. While the court suggested "sanctions" were warranted for offenders who fail to comply with the terms and conditions of probation, it did so in the context of considering defendant's rehabilitative potential and the threat he posed to the community. In its final comments before rendering its sentence, the court made clear its sentence was based on the "nature and circumstances of the offense and *** the history, character[,] and rehabilitative potential of the defendant." After reviewing the court's comments in their entirety, we are not persuaded the court's sentence was intended to penalize defendant for his conduct while on probation rather than his conduct from the underlying offense.

## ¶ 21 III. CONCLUSION

¶ 22 We affirm the trial court's judgment.

13    *13

¶ 23 Affirmed.

11-CF-69
Exhibit F 7 of 7


casetext

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT

LASALLE COUNTY, ILLINOIS

| | | |
|---|---|---|
| TIMOTHY L. PETERSON | ) | |
| Defendant/Petitioner, | ) | |
| v. | > | Case: No: 2011-CF-69 |
| PEOPLE OF THE STATE OF ILLINOIS | ) | Honorable: Cynthia M. Raccuglia |
| Plaintiff/Respondant | ) | Presiding Judge |

## AFFIDAVIT

Originally, I was assigned Timothy Cappillini as Public Defender. After a court appearances I knew he was not going to work. So my wife set out to find a Lawyer for me. My wife, Colleen K. Peterson, found, hired, and paid for Philip R. Nathe (552 S. Washington St., Naperville, IL 60450) to repre- sent me in court. This occurred fairly early in the preceedings. I did not know at the time that this was a per se conflict of interest at the time, nor did Mr. Nathe say anything to me to the effect.

Fairly early on, I noticed that his loyalty to me did seem divided. He started with saying he could easily get rid of this case. Then his tune or demeanor quickly changed. He focused only on the Miranda Rights violations of the police. Though he filed it, we never had a hearing on it or any of the other evidence. It appeared quickly that his loyalty was towards Colleen, and the victim K.L.P.. He was not interested in fighting the case in trial, and constantly told me to consider the victim. He pressured me to get a plea bargin, and said he was using the Miranda Rights Violation as a barginig chip for a reduced sentence. He never challenged any of the evidence, nor did he go over the discovery evidence with me. I never felt like he ever represented me or any of my interests.

This would have happened in 2011, sometime after February. The whole time, I felt like his performance was sub-par. Even the Third District Appel- ate Court upon review found an error with regard For Compliance With Rule 604(d) Respecting the Appointment of Counsel. I suspect it has something to do with regards with him. And he was my counsel all the way up to when I was sentenced under the plea bargin.

Colleen K. Peterson being the gardian and mother of the victim, K.L.P., had a responsibilty and personal interest to look out for and protect her

2

daughter who was also the victim in this court case. However this also sets
up the per se conflict of interest. How can the lawyer, Philip R. Nathe be
able to represent me, the Defendant, and also maintain loyalty to the person
who legally is responsible for the minor victim? This is a clear example of
a conflict of interest.

I, Timothy L. Peterson, Petitioner, affiant, pro se, do hereby declare
and affirm under penalty of perjury as defined in 735 ILCS 5/1-109 of the Code
of Civil Procedure, the undersigned certifies that the statements set forth in
this instrument are true and correct, except as to matters therein stated to
be on information and belief and as to such matters the undersigned certifies
as aforesaid that he verily believes the same to be true. I further declare
and affirm that the contents of the herein document are known to me and are
accurate to the best of my knowledge and belief.

Signed on this 26 day of January , 2023.

Affiant

Any pleading, affidavit or other document certified in accordance with
735 ILCS 5/1-109 may be used in the same manner and with the same force and
effect as though subscribed and sworn under oath.

IN THE

Circuit Court for the Thirteenth Judicial Circuit, LaSalle County

Timothy L. Peterson )
~~Plaintiff~~/Petitioner )
 )
 Vs. )          No. 2011-CF-62
 )
People of Illinois )
~~Defendant~~/Respondent )

## PROOF/CERTIFICATE OF SERVICE

TO: State's Attorney                 TO: Clerk of Court
    Todd L. Martin                       Greg Vaccaro
    707 Etna Road, Suite 251             707 Etna Road
    Ottawa, IL 61350                     Ottawa, IL 61350

    PLEASE TAKE NOTICE that at: 8:00 AM/PM February 20th , 2023, I
placed the documents listed below in the institutional mail at ___Shawnee___
Correctional Center, properly addressed to the parties listed above for mailing through the
United States Postal Service.

Four (4) Affidavits

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109 I declare, under penalty of perjury
that I am a named party in the above action, that I have read the above documents, and that
the information contained therein is true and correct to the best of my knowledge and belief.

DATED: 2/20/2023                /s/ Timothy L. Peterson
                                Name: Timothy L. Peterson
                                IDOC No. M22384
                                Shawnee Correctional Ctr.
                                ~~POB~~ 6665 State Rt. 146 E,
                                Vienna , IL 62995

Revised 4/15/16

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
LASALLE COUNTY, ILLINOIS

| | | |
|---|---|---|
| TIMOTHY L. PETERSON | ) | |
| Defendant/Petitioner, | ) | |
| v. | > | Case No: 2011-CF-69 |
| PEOPLE OF THE STATE OF ILLINOIS | ) | Honorable: Cynthia M. Raccuglia |
| Plaintiff/Respondant | ) | |

## PROOF/CERTIFICATE OF SERVICE

TO: TODD L. MARTIN, States Attorney, County of LaSalle, Illinois
    LaSalle County Governmental Complex, 707 Etna Road, Suite 251
    Ottawa, IL 61350

TO: GREG VACCARO, County Clerk of Court, County of LaSalle, Illinois
    LaSalle County Governmental Complex, 707 Etna Road
    Ottawa, IL 61350

PLEASE TAKE NOTICE that on the date below indicated I have mailed a copy
of the enclosed EMERGENCY MOTION, and AMENDED PETITION FOR WRIT OF CORRECTION/
MODIFICATION OF SENTENCING to the Clerk of Court of the LaSalle County Circuit
Court for Filing in the above captioned cause(s).

Dated: _1_ / _26_/2023          Submitted by,

                                /S/ _____

                                Timothy L. Peterson, Petitioner, pro se
                                IDOC#: M22384
                                Shawnee Correctional Center
                                6665 State Route 146 East
                                Vienna, IL 62995

PETITION FOR
EXECUTIVE CLEMENCY RELIEF: PARDON/COMMUTATION OF SENTENCE
IN THE MATTER OF TIMOTHY L. PETERSON

"This Petition for Clemency based on Rehabilitation and Restorative Justice is submitted to the Prisoner Review Board and the Illinois Governor's Office by Timothy L. Peterson, #M22384, a Person in Custody at Shawnee Correctional Center. I do NOT request a Public Hearing in this matter. I respectfully request that the Prisoner Review Board and Governor Pritzker process this request and grant relief in the form of Pardon or Commutation to Time Served."

## 1. Personal Information

Name: Timothy L. Peterson
Facility: Shawnee Correctional Center
IDOC#: M22384
Address: 6665 State Route 146 East, Vienna, IL 62995
Telephone: (618) 658 - 8331
Date of Birth: February 1, 1974
Place of Birth: Chicago, Illinois
Social Security Number: 338 - 76 - 5292
Aliases: n/a
Prior Military Service: US Army Reserve (4/19/1991 - 11/3/1992)
Prior Clemencies: n/a
Marital Status: Divorced

## 2. Conviction at Issue

Offense: Predatory Criminal Sexual Assault (Class X Felony)
Case Number: 2011 CF 69
Date of Arrest: February 5, 2011
County of Conviction: LaSalle County
Conviction Type: Guilty Plea
Sentencing Judge: Cynthia M. Raccuglia
Sentence: 21 Years at 85% (17.85 Years)
Time Served: 11+years

## Account of the Offense

"In early February 2011, officers began an investigation into the defendant for sexually molesting his daughter for the last several years. His daughter, who is now eleven [at time of arrest], stated that her father has been 'putting his thing in her thing' for several years now, almost once a week. She stated when he does this, he moves up and down and then 'catches white stuff in his hand.' She also stated he also fondles her vagina with his fingers and puts his fingers in her vagina. She stated he also puts his penis in her mouth. The defendant was interviewed and admitted to doing inappropriate sexual things with his daughter." The above can be found on my Mittimus where it says, "FACTS AND CIRCUMSTANCES OF OFFENSE:". Though some of the details may not be completely accurate, the spirit and nature of the offense is accurate. I sexually molested my oldest daughter and there is no excuse

for that. I seriously hurt and broke trust with my daughter whom I truly loved by doing one of the worst possible things I could have done to Kirsten. If she were here, I would simply tell her I'm sorry for everything that I did to her. To even try and ask for forgiveness from her would be unthinkable. When I sexually abused her, I let her down, I let God down, I let my wife of eleven years down, I let my family down, I let my community down, and worst of all — I let myself down.

### 3. Other Cases for Which Clemency is Not Sought

Records are unavailable, but this is what happened to the best of my recollection: It was back in the early-to-mid 1990s. I believe I was about 21 or 22 at the time. I was employed at Family Inns, in West Lafayette, Indiana in House Keeping/Maintenance. One early morning, someone I knew (don't recall his name) came to me stating his rent was due and his landlord wouldn't take his money orders. So I cashed his money orders against my bank account. The following night, the police were at my door, saying the money orders were stolen and the guy I knew was trying to say I was the mastermind. Come to find out, he had stolen them from where he worked. Eventually the Forgery charge against me was dropped.

Case Number: Unknown
Offense of Conviction: n/a
County: Tippecanoe County, Indiana
Sentence: Case Dismissed/Charge(s) Dropped
Sentence: Dismissed
Description: Felony Forgery

### 4. Personal History

Below is my personal history which I hope will give you a better for for me as a person. As with all personal stories, this one is uniquely mine. I hope it will give you some personal insights about me, and my potential for the future.

### Childhood, Education, and Work History

- Childhood
  I was born at the Swedish Covenant Hospital in Chicago, Illinois on February 1, 1974 to two proud parents, Timothy & Linda Peterson. We lived in DesPlaines at the time. My sister, Beverly, was born on Halloween the following year. We moved into a townhouse and then into a single-family home in Hanover Park, IL shortly after that. My grandmother on my mom's side led me to Jesus when I was just 4 years-old. Oh how I loved Him and wanted to tell everyone about Him. Then my grandmother died of cancer which traumatised me. At age 5, during a blizzard, we were in a terrible car accident in which my left arm was broken. During my stay in the hospital, I was molested by a female nurse who performed oral sex on me. This left me very confused, and I didn't tell anyone for years. The following year, one of my baby-sitters forced me to suckle her breasts. Soon, I started school and had a rough time of it. I just wasn't prepared for how cruel kids can be with all the name-calling, bullying, pranks, games of "keep-away," among other things. Nor did it take long for my teachers to notice

Timothy L. Peterson    *3*    Clemency Petition

that I was "different." The school did a battery of tests which I did
well on [IQ 126], and I saw some social workers who weren't sure what
was wrong [though socially awkward]. So they labled me "Learning Dis-
abled," (and treated me the opposite of what I needed). Around this
time, my mom became verbally and physically abusive to me. She would
say things like, "If you were born retarded, at least I would have an
excuse for you," also, "I wish you were never born," and much more.
For punishment she used dishsoap or hotsauce in the mouth, and I often
received beatings that involved large wooden-spoons, coat hangers, a
belt & buckle, or anything handy. I was terrified of her. My brothers,
David & Steven, was born around this time. While in 3rd grade, the
company where my dad worked as a truck-driver moved further away.
My parents decided to have a house built in Naperville, IL. While it
was being built, we all moved in with my grandpa, on my mom's side,
into his home in Zion, IL. This is where I spent 4th grade, and wit-
nessed mom physically beat dad a couple times. By 5th grade we had
moved into our new home in Naperville. In order for dad to get the home
loan, he had to include his overtime (which is not guarranteed). This
led to financial and social hardships. To add to this, my youngest
brother, Daniel, was born around this time. While growing up, I wasn't
allowed much social interaction. This was due to my needing to have all
of my homework and chores completed before I could go out and play.
(I had to clean the whole house like a museum and if I missed a spot
mom literally rubbed my nose it — and don't miss the pee around the
toilet! Plus I had to chop wood for the fireplace, mow the lawn, clean
the garage, gardening, and anything else she wanted.) If I was lucky
enough to get out, I had to be home by dusk. And I was only 12 at the
time. The beatings never stopped. In fact I remember a time in junior
high that my back was so black & blue that she actually wrote a note to
the school to excuse me from the gym showers so they wouldn't see the
bruises and call DCFS. This was around the time I was first exposed to
pornography. She was a friend of mine who lived down the street and
showed me her daddy's porn collection. By high school, I was smoking
cigarettes, having sex, and smoking pot once in a while. At 17 I joined
the US Army Reserves under their "Split-Ops" program. As soon as I
graduated from high school, mom kicked me out saying, I needed to fig-
ure out how to make it on my own. I didn't succeed in the Army and was
quickly discharged. Between the ages of 18 - 22, I was homeless, travel-
ing, and heavily into smoking pot while experimenting with other drugs.

• Educational History

Ann Fox Elementary School, Hanover Park, IL
1979-1983/Kindergarten - 3rd Grade
NOTES: Testing showed an IQ of 126, labeled "Learning Disabled," and
placed in Special Ed classes. Was heavily teased and bullied by peers.
Third grade teacher was verbally abusive towards me and said I would
never amount to anything.

?? Elementary School, Zion, IL
1983-1984/ 4th Grade
NOTES: Was here long enough for house in Naperville to get built. Fell
off playground equipment and hit head multiple times on way down (blood-
loss and unconscious).

Timothy L. Peterson    *4*    Clemency Petition

Elmwood Elementary School, Naperville, IL
1984-1985/5th Grade
NOTES: Was teased by peers.  My teacher, Terry Elkin, was very kind to
me.  She retired at end of school year to help Jerry Fawell campaign,
and gave me Barney the class parakeet to remember her by.

Madison Junior High School, Naperville, IL
1985-1988/6th-8th Grade
NOTES: John Lawler (known from "Supersize Me" documentary) was my gym
teacher.  I was in a special education homeroom.  Still teased and
bullied, though I began to make friends.  Not a good student, but I
found I loved science, art, and shop classes.  Often won awards for my
artwork.

Naperville Central High School, Naperville, IL
1988-1992/9th-12th Grade
NOTES: Graduated and received Diploma.  Cumulative GPA=1.6136.  Class
Rank=484/529.  Classes of special interest: Earth Science, photography,
Aviation, Graphics/Printing, Drawing, Woodshop, Commercial Art, Ceramics,
Jewelry, and Production Graphics.  Was on Sophmore Wrestling team.  Was
working on pilot's license at one time.  Received 6th place in Voca-
tional Industrial Clubs of America (VICA), Springfield State Finals
for Printinting, out of 1200+ participants.

College of DuPage, Glen Ellyn, IL
1998-2000/College
Notes: Earned Associates Degree in Applied Science Photography Technology.
Cumulative GPA=2.527.  Additional classesof interest: Cultural Anthro-
pology, Intro to Computers, Earth Science, Jewelry, and Ceramics.  Was
introduced, dated, and married wife during this time (also had first
child).  Picked up smoking cigarettes again due to stress from parents
getting a divorce at this time.

Lake Land College, IDOC, Shawnee CC & Big Muddy River CC, IL
2014-2015 & 2019/College & Vocational
ENG-098 Communications I/Grade A
BUS-089 Small Business Management/Grade A
ENG-095 Business English/Grade A
PSY-271 Intro to Psychology/Grade A
ATO-040 Vocational-Technical Math/Grade A
ENG-050 Writing for Industry/Grade B
BUS-079 Professional Development/Grade A
COC-051 Intro to Construction Occupations/Grade A
COC-052 Bluprint Reading/Grade A
COC-054 Basic Carpentry I/Withdraw
NOTE: Withdraw was due to Big Muddy River was experiencing severe elec-
trical problems as was beyond my control.  Was transfered back to Shaw-
nee CC on an emergancy basis.  Was placed in "President's List" in
2014 and 2019.

· Employment History

  Jobs in IDOC (Starting with most recent)

  Company: IDOC/Big Muddy River CC
  Job Title: Dietary Dept. Cook
  Dates: 1/2017-4/2017    Pay Rate: $28.80/Mo.

Timothy L. Peterson   *5*   Clemency Petition

Responsibilities: Wash Pots & Pans
Note: Doctor removed me from job for health reasons (diabetes related).

Company: IDOC/Big Muddy River CC
Job Title: Dietart Dept. Worker
Dates: 11/2016-1/2017   Pay Rate: $19.20/Mo.
Responsibilities: Pass out food & water, work in dishroom
Notes: Promoted to Cook in 1/2017

Company: IDOC/Big Muddy River CC
Job Title: Night Yard Man (Leisure Time Services)
Dates: 4/2016-10/2016   Pay Rate: $14.40/Mo.
Responsibilities: Put equipment away ay end of each Night Yard
Notes: Job was fun, except for mosquetoes

Company: IDOC/Big Muddy River CC
Job Title: Sanitation Crew
Dates: 10/2015-4/2016   Pay Rate: $28.80/Mo.
Responsibilities: Wipe tables, sweep & mop chowhall floor
Notes: One of my favorite jobs

Company: IDOC/Shawnee CC
Job Title: Dietary Dept. Worker
Dates: ?/2015-?/2015  Pay Rate: $20.00/Mo.
Responsibilities: Serve food & water
Notes: Was only briefly hired to squash my grienance claiming discrim-
ination against hiring a sex offender

Jobs Prior to IDOC (Starting with most recent)

Company: ICEE (J&J Snack Foods), Lombard, IL
Job Title: Beverage Repair Technician
Dates: 8/2010-2/2011   Pay Rate: $15.50/Hr.
Responsibilities: Repaired Commercial Beverage Systems on site.
Notes: Earned Refridgeration handling License, enjoyed job, had until
arrest

Company: Ken's Beverage Inc., Plainfield, IL
Job Title: Beverage Repair Technician
Dates: 10/2007-8/2010   Pay Rate: $15.50/Hr.
Responsibilities: Repaired Commercial Beverage Systems on site.
Notes: Was trained here, enjoyed job, recruited by ICEE

Company: Osco Drug, Rockford/Downers Grove, IL
Job Title: Shipping & Receiving Clerk/Cashier & 1 Hr. Photo.
Dates: ?/2001-?/2007   Pay Rate: $8.90/Hr.
Responsibilities: Load & unload trucks, process photos, ring up cust.
Notes: Received Pharm. Tech. Lic., Transfered to Rockford for S&R Clerk

Company: Cigarettes Cheaper, Yorktown, IL
Job Title: Store Manager
Dates: (2 weeks 2001   Pay Rate: $?.??/Mo.
Responsibilities: Ring up cust, put away stock, paperwork
Notes: 1 man operation, quit when check was ½ of what I was told

Timothy L. Peterson    *6*    Clemency Petition

Company: Montgomery Wards, Lombard, IL
Job Title: Automotive Repair Processor
Dates: (1 Mo.) 2000    Pay Rate: ?.??/Hr.
Responsibilities: Performed vehicle intake, charges, and out-take
Notes: Laid-off due to company going bankrupt

Company: Little Caesars Pizza LLC, Naperville, IL
Job Title: Store Manager
Dates: (1 Yr.) 1999-2000    Pay Rate: $540/Wk.
Responsibilities: Staffing, run store, ordering, payroll, paperwork, etc.
Notes: Staff shortages led to burnout and quitting

Company: TCF Bank, Naperville, IL
Job Title: Bank Teller
Dates: (6 Mo.) 1999    Pay Rate: ?.??/Hr.
Responsibilities: Create bank accts., & perform transactions
Notes: Quit when learned I didn't agree with business practices

Company: Naperville Chauffeuring, Naperville, IL
Job Title: Limousine Chauffeur
Dates: (6 Mo.) 1998    Pay Rate: Commission & tips
Responsibilities: Drove client to destination, collect fares, paperwork
Notes: Quit when client complained about my snoring while driving

Company: Laramark, Shannandoah National Park Resort, VA
Job Title: Dish Washer
Dates: (2-3 Wks.) 1996?    Pay Rate: ?.??/Hr.
Responsibilities: Washed dishes
Notes: Temp. traveling work; lost job when hit by hurricane Fran

Company: Ocean Pier Restraunt, Galvaston Island, TX
Job Title: Plater
Dates: (3 Wks.) 1996?    Pay Rate: ?.??/Hr.
Responsibilities: Verify order is correct, and garnish plate
Note: Temp. work while traveling and hitch-hiking

Company: Hungry Howie's Pizza, Sault Ste. Marie, MI
Job Title: Worker
Dates: (4-6 Mo.) 1995?    Pay Rate: ?.??/Hr.
Responsibilities: Make pizzas and ring up orders
Notes: Temp. work while traveling and hitch-hiking

Company: Family Inns of America, West Lafayette, IN
Job Title: House Keeping/Maintenance
Dates: (6 Mo.) 1995?    Pay Rate: ?.??/Hr.
Responsibilities: Clean rooms & set up banquet halls
Notes: Lost job when arrested

Company: Garcia's Pizza in A Pan, West Lafayette, IN
Job Title: Worker
Dates: 1994?    Pay Rate: ?.??/Hr.
Responsibilities: Made & baked pizzas
Notes: enjoyed job

Company: Bob Rohrman's Auto Mall, Lafayette, IN
Job Title: Auto Detailer
Dates: (6 Mo.) 1994?    Pay Rate: ?.??/Hr.
Responsibilities: Cleaned and polished cars to showroom condition
Notes: Received "Employee of the Month" first month there, favorite job

Timothy L. Peterson    *7*    Clemency Petition

Company: Hamilton Mall, Chattanooga, TN
Job Title: Street Sweeper
Dates: (1 Mo.) 1993   Pay Rate: ?.??/Hr.
Responsibilities: Drive street sweeper around mall parking lot
Notes: Quit due to sweeper being down all the time and having to sweep
lots by hand

Company: McDonalds, Zion, IL
Job Title: Closer
Dates: (6 Mo.) 1993   Pay Rate: ?.??/Hr.
Responsibilities: Grilled orders & cleaned after closing time
Notes: Quit when moved to Chattanooga, TN

Company: Ogden 6 Theaters, Naperville, IL
Job Title: Usher
Dates: (6 Mo.) 1992   Pay Rate ?.??/Hr.
Responsibilities: Maintained order in houses, and some cleaning
Notes: Quit when I went to Ft. Sill for Army

Company: Ponderosa, Naperville, IL
Job Title: Waiter/Cashier
Dates: (6 Mo?) 1991-1992   Pay Rate: ?.??/Hr.
Responsibilities: Took orders, brought out food, rang up orders
Notes: Quit when falsely accused of stealing (Asst. Mngr. caught)

Company: McDonalds, Naperville, IL
Job Title: Grill & Cashier
Dates: (1= Yr.) 1990-1991?   Pay Rate: ?.??/Hr.
Responsibilities: Rang up orders, and worked various stations
Notes: Left when I went to Ft. Jackson for Boot Camp

- Hardships and Violence As An Adult
  When I was 17 and in the Army, during Boot Camp, I was involved in a
  training accident during a live-fire exercise. It was a very close
  call as I was almost shot while trying to put out a fire down-range
  caused by tracer rounds. At age 18, mom kicked me out of the
  house after graduating high school and left for more Army training. I still
  couldn't come back home even after an early discharge from the US Army
  Reserve at age 18. From ages 18 to about 22 I was basically homeless,
  traveling, or hitch-hiking. During this time I had a string of brief
  romantic relationships, none of which could quiet the underlying anger,
  resentment, and sadness I felt due to mom kicking me out. I became
  involved with drugs (marijuana, opium, cocaine, hash, & LSD - settled
  on marijuana as drug of choice). Lived in Chattanooga, TN briefly
  before moving to the Lafayette, IN area. While there, while walking
  I was involved in an incident with a car that severly dislocated my
  right shoulder. Later, I had legal issues and was charged with Felony
  Forgery. When I thought it was resolved, I left state and headed north.
  Eventually I settled in Sault Ste. Marie, MI for a little bit. From
  there I went to Traverse City, MI where I met one of my longer held
  girlfriends. We spent nearly 9 months together, traveling & hitch-
  hiking across the United States and northern Mexico. While in the
  state of Oregon, we were robbed. South of Los Angeles, CA I was mug-
  ged by gang-bangers at gun-point and then severly beaten when they
  realized I had no money. When we were in Mexico swimming in the ocean,
  I caught a wave wrong and dislocated my right shoulder again. Then

Timothy L. Peterson    *8*    Clemency Petition

while in New York state, I was almost arrested because someone else
named "Tim Peterson" had a warrant (other details did not match, like
age and race). When my girlfriend got pregnant, she dumped me, went
home to have the child, and gave her up for adoption. While I was
alone in Virginia I lost my dishwashing job to hurricane Fran. From
there I hitch-hiked back to Sault Ste. Marie, MI where my right shoulder
became so unstable that it would dislocate on its own. Surgery (Mod-
ified Bristow procedure) was required. Though stablized, I continue
to have pain and a limited range of motion. After surgery, I wouldn't
be able to work for over a year while I recovered. It was suggested
to me at this point that I go into Teen Challenge to get my life stra-
ightened out while I waited for my shoulder to heal. I started at the
Teen Challenge Induction Center in Chicago, IL. After that I went on
to Teen Challenge of America in Cape Girardeau, MO where I graduated.
(And I haven't touched illicit drugs since.) After completion I was
welcomed back home by mom and attended college. While at College of
DuPage earning my Associates Degree, I met my bride to be. Soon we
were engaged, then she became pregnant, and had our oldest daughter in
1999. After graduating in the summer of 2000, we got married. I was
26 at the time. Over the years, like any marriage, we had our ups
and downs. But overall, it was a good marriage. We even had three
more children together over the years. <<< "Factors/History That Led
To The Offense" would fit in here for chronology. >>> After my offense
and incarceration it does not mean the hardships and violence I suffered
as an adult suddenly stopped. Now while being processed into IDOC
at the Northern Receiving Center (NRC), I was classified as "vulnerable"
for a number of reasons. Some of these include being molested as a
child, due to my right shoulder surgery I wouldn't be able to defend
myself in a fight, this is my first incarceration, the nature of my
offense, and more. Then in July of 2011 I was shipped to Shawnee CC.
I was devastated that I was moved so far away from everyone I knew.
My first celly in General Population was a man named Wayne Makulski.
He was a white-supremasist who just got out of segregation (seg) for
fighting. I wasn't there long before Mental Health (back when they
still had power) pulled me out for an emergancy reason. After my sec-
ond celly, I was single-celled for awhile before going on a court writ
for 135+ days at NRC, starting in January of 2012. When I returned, I
was once again single-celled. Then in June of 2012 I was assaulted,
had my cell tossed, and was threatened additional violence by officer
Causey. I wrote a grievance on the matter and showed it to Chaplain
Michael R. Williams (now retired) who told me I need to turn it in.
Out of retaliation I was told I had to be removed from my cell for my
own safety. They processed me and my property in seg where they broke
my shaving razors in front of me and said that now I'll be getting a
disciplinary ticked for contraband (6/18/2012-308 Contaband-1 month
in seg). All this because I filed a grievance on an officer who
assaulted me because of the nature of my case. When I got out of seg,
Joshua Porter was my celly and he refused to talk to me because of my
case. Next was Brian Kuntinac (who turned out yo be Wayne Malkulski's
cousin), and then Wayne was moved onto the wing who made it everyone's
business to know what I was locked up for. This made things difficult
for me. No one on the wing would have anything to do with me. When
I had Jonathan Weber as a celly, things got a bit better since he liked
me as a person and we could talk. But this was about the time an attempt

Timothy L. Peterson    *9*    Clemency Petition

was made on my life.  I discovered a snapped-off corner of a razor-
blade in my pasta, just before I swallowed it.  I reported what hap-
pened to an officer.  They suspected Wayne Malkulski had something to
do with it since he worked on the food-line that day, but there was not
enough evidence for them to act on.  Next, I had William South who was
a whitesupremasist for a celly.  When I was on a visit with my parents,
he went through my property and dug out my charges.  Then he posted
them on the bulletin board for everyone to read.  When I got back from
the visit, Mr. South said I wasn't welcome in the cell anymore.  When I
reported to an officer that I wasn't allowed back in the cell, I was
taken to seg for an investigation and was exhonorated about a month
later.  Then Eugene Fenton was my celly and he was okay.  Next was
Luis Lopez who destroyed my Walkman and stole my beard trimmer.  While
Jared Smith was my celly, the whole prison was hit by "Orange Crush"
(IDOC Special Response Team).  Orange Crush treated us all in a cruel,
demeaning, inhumane manner the whole time.  And we were kept in hand-
cuffs behind our backs with our heads down the whole time while not
allowed to use the bathroom for hours at a time.  Orange Crush took my
hotpot saying it was "altered."  I got a disciplinary ticket (4/23/2014-
202 Damage or Misuse of Property-1 month C grade/3 months hotpot restric-
tion).  I tried to fight the ticket, but to no avail. Several months
later, our housing unit was hit by "Orange Crush" again because an
inmate on another wing assaulted and battered officer Anderson, causing
great bodily harm.  This time Orange Crush was just as torturous and
demeaning as last time, perhaps even more so.  Shortly after this I
was single-celled until I transfered to Big Muddy River CC in September
of 2015.  Once there, I immediately signed up to enter the Sex Offender
Program.  Within days I was in the program and David Owens was my first
celly there.  He wasn't my celly long due to his paranoid-schizophrenia
as he began to make threats of violence based on imagined perceptions.
Then Brandon Geres was my next celly.  It was difficult for us in the
beginning because we were very different.  But eventually we became like
brothers.  Then on February 1, 2017 (my birthday) I signed out of the
Sex Offender Program because Karen K. resigned, and Dr. Holt was taking
over full-time.  I once overheard him say that his job is to make sure
sex offenders never leave (prison).  And for these reasons, I sadly
left the program.  In March, I was moved out of the program wing and
into General Population where I was single-celled from March until
August of 2017.  Then they moved me in with Larry Stark.  Even as I was
in the process of moving in his cell, several inmates I knew warned me
about Larry.  They said he seriously hates sex offenders and had chased
off his last 3 cellys because they were sex offenders.  But I had a
pending transfer and didn't want to ruin it.  Mr. Stark went on with
a list of unreasonable demands that bordered on being psychopathic.
Plus he cleaned the cell multiple times a day.  He constantly told me
what a worthless piece of garbage I was and that I didn't have real
remorse for what I had done.  He felt that if I did, I would have killed
myself.  I was so stressed out that I couldn't have a bowel movement for
over a week.  It was more than I could handle, and I got to the point
where getting out of there became more of an immediate priority than
even my transfer.  I went to an officer explaining what was going on
and that I was fearing for my safety.  Next thing I know, I find myself
in seg for 10 days with them saying that I refused housing (8/7/2017-

Timothy L. Peterson    *10*    Clemency Petition

215 Disobeying a Direct Order/Refusing Housing-45 days C grade/Revoke
1 month good time/1 month commissary restriction). I filed a griev-
ance that since I was on "vulnerable status" I shouldn't have been
Larry's celly in the first place, especially with his widely known
reputation. Basically the response amounted to, if you don't like it,
don't come to prison (talk about deliberate indifference!). Once out
of seg, I was single-celled from August 2017 until August 2018. This
is when I got Richard Konopka for a celly. Being Polish, he was a bit
pushy, nor did he care much for me due to my case. Once he wanted to
show me a martial arts move, and I said "no." He did it anyway. And
in the process he 'popped' my right wrist, which hurts to this day.
Then he demanded he put money on my books and buy him commissary because
he was on C grade and couldn't shop much. One of his friends told on
me and I got a disciplinary ticket (12/2/2018-310/406 Abuse of Privile-
ges & Trafficking or Trading-1 month C grade/1 month dayroom restriction/
1 month Gym & Yard restriction). Then in February 2019, Big Muddy River
was experiencing serious power problems. Many inmates, including myself,
were transfered out on an emergency basis. Frustratingly, I found my-
self back at Shawnee CC. Not even back 10 days and we were hit by
"Orange Crush" and I was single-celled at the time. Then in August
2019, I got Brian Frazier as a celly. He was okay, but then a number
of months later, COVID-19 hit. He went home in April of 2020 where I
remained single-celled until June 2020. This is when Charles Guy became
my celly until July of 2021. He was probably the best celly I ever
had. From then until as of this writing [10/28/21], I have remained
single-celled.

• Factors/History That Led To The Offense
  Eveything changed for me in 2007, when I was about 33 years old. I
  didn't realize it at the time, but my choices to what happened here
  set me on a collision course that led to my offense years later. I was
  working full-time at Osco Drug in Rockford, IL while living in an old
  farm house in Roscoe, IL. I was also Vice President to the Rockford
  Amateur Radio Association (RARA) the year before. Both my wife and I
  were active in the community, volunteering for various events. My wife
  at the time was in charge of the finances. I thought everything was
  going smoothly until I found out it wasn't. My wife was out running
  errands and I was mowing the yard when our landlord came by with an
  eviction notice. That's when I learned she hadn't paid rent in months.
  I was understandably upset. I tried calling my wife on her cellphone,
  but there was no answer. I ended up tearing the house apart in an
  attempt to get answers. Hidden behind a dresser, I found unpaid bills,
  our savings account bled dry, a maxed-out credit card she took out in
  her mom's name, and where she spent over $700 on her parent's gas card.
  I was so completely enraged that if she came home right then, I don't
  know what I would have done. When she did call back, I was still upset,
  and she decided to spend the night with her parents in Darien, IL so I
  would have some time to cool off. With the loss of our home, we were
  forced to move in with her very controlling parents. I couldn't keep
  my job since the commute was too far. We lost everything I cared about,
  and I deeply resented my wife for this. What I didn't realize was that
  this deep-seated resentment would become the poisoned-apple that would
  later inflict destruction on my soul, and then my life. While living
  with her parents I was very stressed-out from dealing with them, looking

Timothy L. Peterson    *11*    Clemency Petition

for a new job, and a new home. Eventually this led to me having a heart-attack (due to an extra node pathway) while at a friend's house. Our friend also has another friend (Susanne) there who ended up driving my wife and I to the hospital. Once I had corrective surgery, the three of us became good friends. Then one day when my wife was away, I ended up having an indiscretion that turned into a secret affair that lasted for months. Eventually my conscience got the best of me, so I called off the affair and confessed what I had done. My wife was understandably hurt and angry. But we both agreed that getting out of her parents home was a more pressing issue, and we would revisit this at a better time. In due time I got a job at Ken's Beverage and we found an apartment in Crest Hill, IL. Now that we were settled, we decided to address my affair. We both wanted to save our marriage, but we didn't know how. Then I suggested a "revenge affair" to even the score. After some thought she agreed, but on two conditions. She would pick the guy, and I would have to watch him have sex with my wife. I reluctantly agreed. After the first time, I was hooked. It was like watching a live porno, but only I could actually join in. I suspect that since I still resented my wife some, this is why it didn't bother me that other guys were having unprotected sex with my wife. Once, she even invited 5 guys to please her in one night. Then when our lease was up, we moved to Earlville where this activity continued for a little bit. At some point my wife's conscience began to bother her and she decided to call it quits. Then on one of my days off, thinking I had the house to myself, I decided to watch a porno. While I was engrossed in the video, my oldest startled me when she said she wanted to try what they were doing because it looked like fun. This decision is one I have regretted ever since. Whenever we were home alone together (perhaps once every 1 or 2 weeks), I would talk her into doing it again. Afterwards, I would feel guilt and shame. But this continued for over a year. Then my oldest daughter began having nightmares. When my wife was asking about her nightmares, this is when it came out what I had done. To say my wife was nonplussed would be a serious understatement. She demanded I get rid of all the pornos, and I complied. Next, she demanded I get counseling. I said sure, but since I was the only one with an income, we needed to figure it out. Unknown to me, that's what she tried to do a few days later. On February 5th, 2011, my wife said she was going to run some errands with the girls. One of the things she did was go to the hospital to inquire about sex addiction counseling. When the hospital asked for details, the police were called in, and everything was taken out of my wife's hands. She didn't want to press charges, so the State picked them up. I was brought in to the police station for questioning (where my Miranda & 5th Amendment Rights were violated - in the transcripts), and I eventually confessed. When I finally confessed to what I had done, it felt like a ton of bricks was lifted. But this also meant I was under arrest. My wife paid for an Attorney, Philip R. Nathe, to represent me (though when she ran out of money, his efforts became greatly diminshed). My wife and 3 younger children came to visit (the oldest wasn't allowed to, since she was the victim in the court case) me in the county jail as often as she was allowed. Then the State's Attorney (Brian Towne) dropped the Class 2 Felony charge and replaced it with 3 of the same Class X Felony charges for the same day (single course of conduct) and on the same victim (even a simple Mittimus would reveal this), which carries a mandatory

Timothy L. Peterson   *12*   Clemency Petition

6-30 year sentence each, ran consecutive, and an MSR of 3 years to
Natural Life (unconstitutional), with a lifetime sex offender registry.
My wife and oldest daughter (the victim) went on their own accord to
plead with the State's Attorney for some show of mercy.  He refused.
My Attorney went to the State's Attorney, explaining that I was being
grossly overcharged, that my confession and willingness to go into
counseling showed that I had remorse.  The States Attorney's reply in
this private conversation was, "I will do everything in my power to
destroy his family."  The best my Attorney could get was a Plea Bargin
for 21 Years at 85% (7 years for each count).  At my sentence hearing,
I apologized to the my daughter (the victim), my wife, the judge, and
the court for my terrible and inexcusable actions.  Judge Raccuglia
said that since she felt my remorse was sincere and from the heart that
she would accept my Plea Bargin.  When I asked if I could kiss my wife
good-bye, the Bailiff refused my last request.  The next morning, I
was awoken to the sound of pebbles bouncing-off my cell window.  My
wife and all 4 children (even my oldest daughter, the victim) were all
outdoors, waving at me and giving their expressions of their love for
me.  Little did I know that this would be the last time I would see
any of them.  And the State's Attorney made good on his promise.  Sud-
denly, my wife was being so harassed by the police and DCFS that she
moved out of the state.  About a year later, she filed for divorce.  I
don't blame her.  I was a terrible husband and an even worse father.
I learned the hard way that I should have resolved my resentment quickly
instead of letting it fester until it ruined my life.  So I was deter-
mined not to leave prison the same man that came in.

## Military History

Date Entered US Army Reserve: 19 APR 1991
Date Of Discharge: 03 NOV 1992
Type Of Discharge: Uncharacterized
Reason For Discharge: Entry Level Statusperformance & Conduct
Grade/Effective Date: PV1/06 APR 1992; PV2/06 OCT 1991; PFC/07 JUN 1992
    (Discharged as PV2 for Conduct)
Stationed/(Note:)/Effective Date:
   MEPS, DesPlaines, IL/(Enlistment)/19 APR 1991
   Co C 120th AG BN RE CL, FJSC/(Orientation)/10 JUN 1991
   Co B 3D BN 28th Inf Rgt 1st Bt Bde/(Basic Trn)/14 JUN 1991
   95th AG BN (Rec) Ft Sill OK/(ADT)/02 JUL 1992
   Btry C2d Bn 80 FA Ft Sill OK/(AIT)/13 JUL 1992
   Btry C 2/80th W34T2F Ft Sill OK/(Out Processing)/02 NOV 1992
   1 FA BN 7 SVC BTRY, Chic IL/(Res. Stn.)/?? AUG 1991
Military Occupational Specialty: (31V) Unit Level Communications Maintainer
Enlisted Under USAR Split Training Program
Nonjudicial Punishment (NJP): Failing To Obey Lawful Order (Smoking in Latrine)

General Discription: I enlisted on April 19th, 1991 in the US Army Reserve
under their Split Training Program.  This is where I would do Basic Training
during the summer between my Junior and Senior year in high school.  Then
during my Senior year in high school, I would attend reserve drills at my
home base in Chicago, one weekend a month.  After graduating high school, I
would receive the rest of my training.  While in Basic Training at Fort
Jackson, SC, I was involved in a training incident during a live-fire

Timothy L. Peterson     *13*     Clemency Petition

exercise.  It was a close call, as I was almost shot while trying to put out
a fire down-range caused by tracer rounds.  Also I discovered that I had
difficulty adjusting to all of the sudden loud noises from gunfire and gren-
ades.  To this day, I easily get startled by sudden noises - especially if
I'm focused on something else.  My Reserve Drills during my Senior year of
high school were fairly unremarkable.  But I really emjoyed school in the
Army.  Here I learned about Electronics, Soldering, Trouble-Shooting & Repair,
Radio Propigation, Equipment Set-Up & Use.  These skills I needed as a Unit
Level Communication Maintainer ended up being very useful later in life.
Unfortuneately I got caught smoking in the bathroom (lost rank), had diffi-
culty adjusting to military life, and failed my physical fitness test.  On
November 3rd, 1992, I was discharged under Chapter 11 for Entry Level Status-
performance and Conduct.

## REHABILITATION: Me Today

There is a deep connection between my mind, body, and spirit.  Any meaningful
rehabilitation for me will be working on all three.  For the purpose of clar-
ity, I have broken down my efforts by catagory rather than chronological order.

- Programs & Groups
  The programs and groups listed here are by no means complete.  Only ones
  that I can remember are listed, and documentation has been provided when-
  ever possible.  I have made every effort to get a copy of my program
  records from my master file, without success.  Even my FOIA request was
  denied.

  Malachi Dads (9/24/2012-9/25/2012)
  This was a 2-day seminar on how I can become a better dad, and why as a
  father I'm so important to my children as they are growing up.

  Freedom-God's Way (6/21/2013-6/23/2013)
  This was a 3-day seminar that taught me biblical truths on being deter-
  mined not to repeat the failures of my past, many of which hurt others,
  one way or another.

  Answering The Call (Completed 8/10/2013)
  Here I was taught the importance of discipleship and becoming the man
  that God called me to be.

  Behavior Modification (Completed 9/12/2013)
  This program was done through Clinical Services (Scott M. Murray, LCSW),
  and taught me that I can change my behavior by how I think and choose to
  respond differently.

  Anger Management (2014? & 2016)
  I had taken Anger Management while at Shawnee I think sometime in 2014,
  then again in 2016 as part of the Sex Offender Program at Big Muddy
  River.  I learned to question my beliefs when I chose to respond with
  anger and see about changing unhelpful beliefs.  Also, I learned a num-
  ber of stategies for stress management which otherwise could lead to
  anger which could have been easily avoided.

  Freedom From Fear (Completed 9/1/2015)
  This 2-day seminar was sponcered by New Life Corrections Ministry, and
  taught me that when I learn to trust God, I can become free from un-
  healthy fear.

Timothy L. Peterson   *14*   Clemency Petition

BMRCC Sex Offender Program (9/2015-2/2017)
I was in the Sex Offender Program for nearly 1½ years. While there, I did a lot of book-work, was in Orientation Groups, Mentor Groups, Anger Management classes, RET classes, CBT classes, Discovery Groups, Offence Cycles Group, Victim Empathy, reviewing my childhood, reviewing my sexual offense, reviewing what led up to my offense. Certificates were only given during the orientation phase which is why so few are presented. I credit much of my rehabilitation to Karen K. and the Sex Offender Program. Even my parents noticed a huge and positive difference in me. Since I was abused as a child, I had learned a number of coping skills that had helped me survive as a child. However, these same coping skills were also destructive as I grew up. The main goal of the program was to replace these destructive coping skills with new skills to deal with life's problems so we do not reoffend or hurt other people. In order to do this, we had to dive deep into my childhood and identify the abuses. Then I had to learn what coping skill I developed to deal with the abuse. From there, I looked into if it was a healthy coping skill or an unhealthy coping skill. Then I looked at the beliefs behind the unhealthy coping skills so I could identify what needed to be changed. For each coping skill that needed to be changed, I had to think about what would be a healthy new response. Then there was also Offense Cycles that had to be identified. If I can learn my Offense Cycle and identify when I am in the middle of one, then I can break the cycle. When it came to triggers, if I learn what they are, I can then avoid many of them. For the few that may be unavoidable, then it is helpful to have a plan to put into action as soon as I realize I'm being triggered. I also learned to see things from the perspective of a victim. To learn what their thoughts and feelings are towards unwanted attention, etc. I was also taught how to be a better listener, and to put myself into other people's shoes. In addition to all this, we had a Discovery Group where we would discuss something we are currently facing. Others in the group would give their input or offer suggestions. Sometimes, just talking about it helped. But it also gave us an opportunity to put into practice some of what we learned in the various classes. I learned a lot in these classes and groups. The Sex Offender Program was strict for a good reason. It gave us a practice of skills needed to follow strict rules imposed on sex offenders in the outside world. I guess you can tell I learned a lot.

Rational Emotive Therapy - RET (Completed 3/2/2016)
This therapy had me look at how I feel about situations. This is because emotions can move me to action, and by changing how I feel about something, I can change how I respond.

Cognitive Behavioral Therapy - CBT (Completed 2016)
In many ways, I found it to be similar to the Behavior Modification Group. But the focus was more about thinking ahead of time on what I should do in order to avoid triggers and have an escape plan if a trigger is encountered.

Anxiety Group (?/?/2019)
I was in this group in 2019 at Shawnee CC, which gave me some tools to help combat anxiety, and move with a little more confidence.

· Self-Help Books
Over the years, I have read many Self-Help Books. Some were geared towards helping me with finances or making money. Some were to help me

Timothy L. Peterson    *15*    Clemency Petition

explore my past, while others were geared towards improving relation-
ships. I also looked at books that would help me with my artwork, or
exercises, or some other area of my life that I wanted to improve. The
list of books listed here are not complete by any means. But should give
you an idea of some of the Self-Help Books that I have read.

Game Plan For Life, by Joe Gibs
Though a Christian book, it does show me how to make a plan for my life
and then carry it out until I succeed.

The Furious Longing Of God, by Brennan Manning
Through a number of short stories, he shows me that the true longing of
the soul is God (which I often mistakenly try to fill with other things).

The Unseen Essential, by James P. Gills M.D.
Though told through a fictional narrative, this book is very instructive
on teaching me what genuine faith is.

Rekindled, by P&J Williams (with J. Jenkins)
Written mainly by a former Bulls NBA team manager and his wife, they
explained to me how their marriage almost ended. And then they explained
how they "rekindled" their love for each other.

Changing Course, by Dr. Claudia Black
A book used by the BMRCC Sex Offender Program, it had me dive deep into
my childhood to help me see why I responded to things a certain way or
held certain beliefs. Then I was challenged to change those which were
harmful to me or my relationships.

Millionaire Prisoner, by Josh Kruger
An amazing book written by an IDOC inmate. He explains to me how to make
financial gains. However, true wealth involves improving me as a whole.

How To Win Friends & Influence People, by Dale Carnegie
An indispensible book from the early part of the twentieth century. He
teaches that I shouldn't criticize, be sincere in my appreciation, I
should be genuinely - interested in other people, be a good listener,
I should avoid arguements, let the other person do the talking, and more.

Think And Grow Rich, by Napoleon Hill
Though mostly a financial book, he stresses the importance of disciplin-
ing my mind and to be careful what I think about.

Who You Are When No One's Looking, by Bill Hybels
A studyguide written by the pastor of Willow Creek Community Church,
designed to help me explore my personal character and integrity.

The 5 Love Languages, by Gary Chapman
The 5 love languages are Words of Affirmation, Quality Time, Receiving
Gifts, Acts of Service, and Physical Touch. He stresses that I should
communicate my love to someone through the one love language they best
understand (usually the one they naturally tend to use to express their
love towards others).

Men Are From Mars - Women Are From Venus, by Dr. John Grey
This book highlights the differences in thought and communication be-
tween men and women. As a result, I can better avoid needless offense.

Self-Publish Your Novel Made Easy, by Richard N. Williams
This colorful step-by-step guide shows how easy it is for me to self-

Timothy L. Peterson   *16*   Clemency Petition

publish my books on multiple platforms.  This will be very helpful for
when I get out and want to get my books published.

  Rich Dad - Poor Dad, by Robert Kiyosaki
A famous book on finance.  The rich see money as something to invest,
while the poor see money as something to spend.

  The Ultimate Survival Manual, by Rich Johnson
This guide teaches me not only a number of survival hacks in a broad
range of situation, but also to solve the most pressing problems until
I'm out of the emergency.

  101 Textures in Oil & Acrylic, by Mia Tavonatti
A useful guide to help me with my painting.

  Acrylics For the Absolute Beginner, by Charles Evans
Tips and plans for a number of landscape paintings.

  Aging Well with Diabetes, by BottomLine Inc.
Helps me improve and possibly reverse my diabetes through proper diet
and exercise that is geared towards my specific needs.

· Correspondence Bible Studies
  As with mental health, my spiritual health is just as important.  We
  Always act upon what we really believe.  One way for me to change my
  actions is to change what I believe.  Correspondence Bible Studies is
  one way of doing this.  Listed below are two of them that I have partic-
  ipated in over the years.

  Emmaus Correspondence School (2013-2019)

  Prayer Scripts, by Rose Marie Jones (2014-2016)

· Poems Written in Prison
  I find that not only is writing poems theraputiv (especially in stressful
  situations), but it also helps me explore some of my emotions.  Below is
  a list of poems I've written while in prison:

  Devil In The Mirror (3/10/2012)
  Poured Out (9/21/2012)
  Chuch-Hole Turtle (6/2/2014)
  My 23rd Psalm (6/15/2014)
  Living (8/4/2014)
  The Day We Met (1/5/2015)
  Where Am I? (2/23/2015)
  Tangled Webs (8/2/2015)
  Radiant Redeemed (8/20/2015)
  Lazarus (5/3/2016)
  Sin (5/11/2017)
  Hang (10/2/2017)
  Emptiness (3/14/2018)
  Where I Belong (3/26/2018)
  Heart To Heart (3/26/2018)
  What I Wanted (4/28/2018)
  My Psalms 18 (5/9/2018)
  My World Is A Black-Hole (5/25/2018)
  Erases All My Blues (5/26//2018)
  Why I Struggle To Trust Them (7/11/2019)

Timothy L. Peterson    *17*    Clemency Petition

Eternity Is Just One Heartbeat Away (10/10/2020)
I'm Just One Heartbeat Away (10/10/2020)
Thoughts Of You Warm My Heart (11/2/2020)
The Indian Princess & The Tiger (2/19/2021)

- Book Manuscripts Written While in Prison
  I have found that writing in general is therapeutic for me.  I'm a much
  better writer than I am a speaker.  I am able to think about what I want
  to say and and better oganize my thoughts.  Every day for over 4 years,
  I have read a portion of the Bible and then journalled about what stuck
  out at me.  This has been the foundation for a number of my book manu-
  scripts, and has the added benefit of being potential income when I get
  them published.  Below is a list of my book manuscripts written while in
  prison.

     Letters From My Heavenly Father (110 pages)
     The Ultimate Good News (117 pages)
     Journeying Through · The Holy Bible · For A Year (365 pages)
     Journeying Through · The Gospel of John · For A Year (365 pages)
     Journeying Through · The Book of Proverbs · For A Year (366 pages)
     Journeying Through · The Letter to the Romans · For A Year (365 pages)

- Artwork
  Artwork and other forms of creative expression have been important to me
  even from my earliest years.  I find it to be theraputic, helps me relieve
  stress, and is another form of communication.  I have a collge degree in
  photography, while I also enjoy jewelry making woodworking, ceramics,
  drawing, painting, and more.  Over the years I have won awards and even
  sold some of my art.  Below is a list of some of the artwork I have done
  since I have been in prison:

Drawings
  A portrait of a dog
  A portrait of each of my kids
  A portrait of my dad
  Various sketches of my cell
  A portrait done for an inmte
  A number of greeting cards for my parents
  A buffalo in wildlife scene for my girlfriend
  A dog wearing a green bandana for my girlfriend
Paintings
  A blue butterfly
  A woman whispering into a man's ear
  A sun lit field
  A beach scene
  A distant farmhouse scene
  A path across the moors
  Cresswell landscape
  A woodland path
  Field & tree
  A village street
  Large 3D cube in primary colors and cutouts
  Two Indian teepees in nature sceen
  An Indian princess & a tiger
  An underwater ocean scene

Timothy L. Peterson    *18*    Clemency Petition

• Chapel
Chapel services and related activities not only promote spiritual growth
for me, they often teach me to become a better person, and challenge me
to look out for the needs of others. Additionally, it gives me a commun-
ity where I can feel safe and have a sense of belonging. Often, others
will give encouragement when I need it, or I feel like I can share with-
out being judged. Below is a list of some of the chapel related services
I have been apart of while in prison:

Christian Service
This is the standard weekly service I attend (COVID-19 has interrupted
this). We have a time for signing worship songs that often connects us
together while we offer our appreciation to God for His daily provision
and His offer of redemption. We also have a time of prayer where I can
express my gratitude and make my petitions known to God. We also have a
time of teaching where someone expounds or teaches from a passage in the
Bible. Though I may have read those verses many times before, I frequent-
ly receive new insight on how I can improve my life. Often there is a
little time for fellowship, even if it is brief. This is when I feel
encouraged and uplifted.

Penticostal
This shares many of the same features and benefits as the Christian
Service. Often it is held weekly in the evenings and facilitated by a
volunteer from a Penticostal church. I greatly enjoy these services as
well.

Lutheran Bible Study
Much less emphasis on worship songs or prayer. The focus is on under-
standing the Bible in its proper context. It's not uncommon for the
Lutheran volunteer to dive into the original tongues in order to get a
more precise understanding of the author's intent. I really enjoy this
Bible study and frequently learn something new to apply to my life to
help make me a better person.

Choir
I was on the worship team (choir) for several years (Chaplain Williams,
retired) where I made good friends. Not only did we practice a couple
times a week, we were expected to sing in a number of chapel services
throughout the the week. I enjoyed singing Tenor, and it helped me get
over performing in front of a crowd. To this day I'm still friends with
some who were in the choir with me.

Christian Motorcycle Association
This group of monthly volunteers shares many of the same features of the
Christian Service. However, they have more of a focus on contemporary
worship songs and their teaching is a bit mor impassioned. This is
likely my most favorite service of the month.

Concert Of Prayer
With the help of Chaplain Michael R. Williams (now retired), I founded
Concert of Prayer. And it was only recently discontinued a few years
ago by by Chaplain Lambert-Goheen. Though disappointing, it is a fact
of life. I find prayer beneficial like meditation and gives me a deeper
sense of peace and a connection that manifests itself in other positive
ways.

Timothy L. Peterson    *19*    Clemency Petition

Baptist Service
Much like the Christian Service, but with Baptist volunteers.

Mennonite Sing-A-Long
This group comes in on a quarterly basis and does a beautiful job sing-
ing hymns in acapella, and a brief teaching afterwards.  I always look
forward to their outstanding singing.

· Bible Reading
Reading the Bible everyday is important to me.  For every part of the
Bible is "God-Breathed" and is useful one way or another.  It shows me
truth, exposes my rebellion, corrects me when I'm in the wrong, and
teaches me to live a good life while treating others right - as God
intended.  Over the years, I have read the entire Bible, cover-to-cover,
more than a dozen times, and some portions have been read much more
than that.  In fact, I attribute much of my rehabilitation to my read-
ing the Bible and becoming very familiar with it.

· Physical Exercise
No part of rehabilitation would be complete without a physical component
to it.  Not only does it help with my overall health, it also helps my
mind, improves my mood, and boosts my immune system.  I have forced
myself to exercise until it became a daily habit.  I started out small,
and then slowly added to my daily regimine.  Now I have more energy,
more self-control, and I feel better too.  Below, I have listed my cur-
rent exercise regimine:

Jog in place, 40+ minutes
3 sets of 105 standing-wall pushups (due to shoulder)
3 sets of 25 squats
3 sets of 50 modified dips (due to shoulder)
3 sets of 60 crunches
3 sets of 80 leglifts
Walk laps around day room whenever possible

· Veterans Group
I got to meet once a week with other veterans whom I can identify with.
We have been able to share experieces, our pain, and our frustrations.
I feel that it is a safe and theraputic enviroment.

· Art Class
I really enjoyed this Art Class at BMRCC, sponsored by Leisure Time
Services.  The class enviroment was perfect for painting.  Though there
was no staff or formal instruction, if I got stuck other inmates were
more than happy to help.  This was a great way to relieve stress and was
very theraputic.

· Tutoring
Over the years, I've come to realize that I'm more educated than many
of the persons in custody.  Instead of feeling superior, I feel a respon-
sibility to tutor anyone wanting help.  And often, I succeed in finding
a way of explaining that is understood.  In addition, I have a type-
writer and have used my typing skills to type letters and legal docu-
ments in order to help people out.  I see each wing I've lived on as a
small community, and I try to do what I can to make it a better place.

Timothy L. Peterson    *20*    Clemency Petition

While in prison, I have changed in a number of ways.  Realizing I would eventually get out, I was determined not to leave the same person that came to prison.  I love to learn and I refused to let IDOC's discrimination against my sex offense stop me from growing.  I kept sending requests for work, vocational school, college classes, programs, and clinical services.  While waiting for one of these to open up, I would do a Bible study, write, paint, or draw.  The point is that I worked at staying busy.  Through books, classes, groups, and introspection; I slowly evolved into someone who is a better listener, cared more about others, became more empathetic, made people more of a priority, and became more self-confident.  I know more about myself and who I am.  Since I'm less concerned about what other people think of me, I'm more free to do what's right.  I tend not to think in the sense of "me first" as now I try to find the "win-win" scenario when I'm dealing with people.  I have also over come some of my social awkwardness and have come to fit-in better.  No longer do I comment on everything I hear, as I remind myself that it's not my conversation and to stay out of it.  These are just a few of the changes I've made.

All that said, I'm the one who has to wake up each day, and I realize that I raped my daughter, shattered my (ex-)wife's heart, destroyed my family that I dearly loved, and hurt my community.  I have to live with the pain of my choices, whether I'm behind bars or not.  Over the years, I have missed out on watching my children grow up, and have not seen them as they go through many of life's "firsts" experiences and mile stones.  Nor can that time ever be made up.  It is simply lost to time.  Though I wish I could go back in time and undo the damage I have done, I can't.  But I can tell others not to do the things I have done, or make the mistakes that led to my offense.  I can still look for ways to make this world a better place.  Real remorse can't be with words alone.  It must be followed up with action.  And this is why I've worked so hard to become a better person, and make the world around me a better place.

## Physical Health and Care

First of all, I have type 2 diabetes.  Fortunately, I only need to take Metformin as I honestly try to behave.  But as we all know, it tends to progress as we age.  And when my bloodsugar gets too low, my hands tend to shake, making it impossible to write or draw.  Or if it gets too high, I tire easily and sometimes want to go back to bed.  These prison trays are the worst for diabetics.  They contain mostly cheap starches (carbohydrates) like white-bread, pasta, french-fries, potatoes, peas, and carrots.  While protein, fiber, and other healthy food is minimal.  Frequently, the trays have deserts like Jello, cookies, cakes, pudding, and brownies.

Next, I have BPH (enlarged prostate) with a family history of prostate cancer.  My dad currently has prostate cancer, and his father had it until his passing.  I have problems with urination, completely emptying my bladder, a slow urine stream, painful urination at times, having to get up multiple times in the night to pee, erectile dysfunction, and the like.  IDOC refuses to do the Prostate Specific Androgen (PSA) test to check for prostate cancer, saying it's not reliable enough.  However, it is the only test available to detect prostate cancer.  Currently they have me on Terazosin which is barely namaging some of the worst of the urinary symptoms.  But it is not without side-effects.  It lowers my blood-pressure to the point where I easily get light-headed and have even passed-out.

Timothy L. Peterson   *21*   Clemency Petition

Then there is my asthma which I have had since childhood.  There are a number
of triggers like cold air, dust, pollen, and mold that can set off an attack.
This is when I can have great difficulty breathing and can be wheezing pretty
bad.  Currently, they have me on Xopenex for a rescue inhaler.  The worst
time of the year for me is fall and winter, though I can have an attack at
any time.  There have been times in the past where it was so bad that I had to
go to the emergency room to get a nebulizer treatment.

Next is my right shoulder.  This is where I had reconstructive surgery (mod-
ified bristow) on my shoulder.  This has left me with a limited range of
motion, weakness in my arm, and pain from all the scar-tissue.  It is bad
enough where IDOC used it as one of the factors where they determined to put
me on "vulnerable status."  They felt that in a fight, I wouldn't be able to
protect myself.  This also limits what I can do as far as exercises go, thus
a negative factor on my overall health.

Due to all the hitch-hiking and walking when I was younger, I have pain in my
knees and arthritis in my feet.  I often have to force myself initially through
the pain when I exercise.  Though there are times when I have good days, the
pain is often greatly increased during unusually cold weather, and low-pressure
systems.

Then of course is the matter of my right wrist which was injured by one of my
cellys.  To this day I experience pain in my wrist.  I keep hoping the pain
will go away, but it persists.

In early 2021, before there was wide-spread testing in this facility, COVID-
19 ripped through this prison.  I ended up catching it.  It felt like the
worst flu I ever had.  Plus, I had persistant headaches that felt like they
were right behind my eyes.  I had difficulty bteathing so I kept having to
use my inhaler, and it took me months to recover my lung capacity.  Also, I
lost my sense of smell, and that took months to recover as well.  My celly
was also sick as the same time as me.  We were not detected because we didn't
leave our cell while sick, nor put in for sick-call.  As you can see, I do
have some comorbidity traits like diabetes and asthma which puts me at a
higher risk catagory when it comes to COVID, and these close quarters in
prison are a breeding-ground for it.

## Mental-Health Care

When I was younger, I had suffered and 'dealt with abuse.  This includes
phyical abuse, verbal abuse, emotional abuse, and sexual abuse.  This has
had a negative impact on my sense of self-worth and the ability to feel love.
I have gove through programs, groups, read self-help books, and the likes in
order to correct some of this.

When I was a young adult, I had suffered and dealt with drug-addiction.
Going through Teen Challenge was very effective at treating my drug addiction
and it has not been a problem in over 20 years.

Though not officially diagnosed, it's been suspected that I may have Asperger's
Syndrome (Autism Spectrum Disorder).  This may help explain the great intelli-
gence, difficulty recognizing my own emotions, odd behaviors, social awkward-
ness, ecyclopedic knowlege of my interests, misreading social-ques, and
difficulty making eye-contact (when younger, my grandfather worked hard to
correct eye-contact).  For consideration, one of my younger brothers, and
my oldest son were officially diagnosed with Asperger's (which was not avail-
able as a diagnosis until 1995, and I graduated high school in 1992).  I have

Timothy L. Peterson     *22*     Clemency Petition

taken a number of classes and read several books while incarcerated to address anxiety, social awkwardness, and to better read social-ques.

I also deal with a little bit of seasonal depression. I have learned that artificial full-spectrum lighting during the winter months, greatly helps with this.

Of course, there is the matter of my sex offense that has landed me here in prison. I realized I needed help (even before I was sent to prison), so I took advantage of whatever groups I could get into. I was in the sex offender program for nearly 1½ years; plus I took Anger Management, Behavior Modification, Anxiety Group, Rational Emotive Therapy, and Cognitive Behavioral Therapy. I also intend on receiving counseling and attend a recovery group regardless of if it's mandated or not.

## 5. Reasons for Clemency

This section will focus on the reasons why I no longer pose a threat to society, and why I should be released from prison. The reasons below will demonstrate that I should indeed receive a Pardon or Commutation of Sentence:

• **Health and Age.** I'm quickly approaching my 50s, and I do have a number of health issues in addition to the natural hormone decline with age.

Whether due to an enlarged prostate (BPH), or the side-effects of the medication they used to treat it, I'm beginning to experience erectile dysfunction. Not to mention my libido has greatly diminshed over the years. Additionally, IDOC's refusal to do prostate cancer screening (PSA), my continued incarceration poses a substantial risk of early death.

Another health issue is my Type 2 Diabetes. It puts me at much greater risk for heart attack, heart disease, atherosclerosis, stroke, Chronic Kidney Disease (CKD), high blood-pressure, hypoglycemia, hyperglycemia, diabetic retinopathy, neuropathy, and other medical conditions in which my continued inprisonment greatly raises my health risks, including amputation and death. It's bad enough that diabetes is a chronic progressive disease, but the food trays that IDOC offers are some of the worst for diabetics. Our food SHOULD be high in protein and fiber with a low glycemic index, and what these prisons tend to offer is the exact opposite. As a result many individuals in custody see an accelerated progression of their diabetes leading to insulin injections, skin ulcers, amputations, heart attacks, strokes, other complications, and death.

Then add to this, my asthma and the breathing complications that this represnts. Not to mention that this is also a comorbidity factor for COVID-19.

On top of all of this, we are still dealing with the novel Corona Virus pandemic that appears will continue to plague us for some years to come. The close quarters of the prison enviroment created the perfect breeding ground for COVID-19 to rapidly spread among the ranks. And as you can see, I have several comorbidity factors such as diabetes and asthma that puts me at greatly elevated risk of injury and/or death. Just for health reasons alone, I should be awarded a Pardon or Commutation of Sentence, not to mention I'm no longer a threat to society.

Timothy L. Peterson   *23*   Clemency Petition

- **Rehabilitation.**  Pardon or Commutation of my sentence is appropriate
  due to my vast history of rehabilitation while in IDOC custody.  In
  addition, my rehabilitation did not focus only in one area only but
  on my whole person.

  I participated in programs like: Malachi Dads, Freedom - God's Way,
  Answering the Call, Behavior Modification, Anger Management, Freedom
  From Fear, BMRCC Sex Offender Program, Rational Emotive Therapy, Cog-
  nitive Behavioral Therapy, Anxiety Group, Veteran's Group, and others.

  I've read many self-help books, completed a number of Correspondence
  Bible Studies, composed a number of poems, written several book manu-
  scripts (I hope to publish), created a number of works of art, attended
  a wide variety of chapel services, did extensive Bible reading, daily
  physical exercise, went to school, tutored other inmates, and looked
  for ways to be helpful in the community around me at the time.

  As you can see from all this, I have been working on rehabilitating
  my mind, body, and spirit - the whole person, if you will.  At the end
  of this petition I will enclude a number of documents and certificates
  to back up as many of my claims as I can.  In any case, I'm sure you
  can clearly see that I've been determined to leave prison a better man,
  than what entered it.

- **Family Connections.**  I fully admit I messed up really bad.  As a result
  I have also paid dearly on a social level.  Due to my crime, I've lost
  a wife and kids whom I dearly loved.  Plus, I have lost all of my friends,
  my siblings, and some family members because of my horrific choices.

  However, not everything stayed this way.  A few family members stuck by
  my side because they had faith that this experience would make me a
  better person.  They encouraged me to look for any opportunities to
  become a better person, and to take them as they came.  As time went
  on and some positive changes became more evident, more family began to
  correspond with me.  Now I have several family members, some pen-pals,
  and a girlfriend (not romantic, though she is my Bestie) who I'm in
  regular contact with.

  My dad and step-mom have stuck with me from the beginning.  However,
  it was very difficult for my step-mom at first.  This was because she
  was a school teacher who loved children, and my crime was particularly
  painful for her.  And there was times early on that she wasn't sure
  she wanted anything to do with me.  Plus, when their friends discovered
  what I was in prison for, they often told my parents that they shouldn't
  have anything to do with me.  But my parents stuck by my side, and even
  lost some of their friends over this.  As time went on and they saw
  positive changes (especially while I was in the sex offender program),
  we got to be closer.  Now I'm closer to my step-mom than I am even with
  my dad.

  My aunt & uncle on my dad's side from Wisconsin were some of the first
  family to come around.  They even came to visit me while I was still at
  Big Muddy River CC.

  Next was my dad's cousin and her husband from upstate New York.  I've
  known them since I was a little kid.  They would write whenever they
  coul.  Though infrequent, it was always worth it.  This was because
  his work was tied in with the UN, and they often had to travel to diff-

Timothy L. Peterson   *24*   Clemency Petition

erent countries.  I loved hearing about the various places and I often
wished I could go there.  They just recently moved to Illinois and ex-
pressed an interest in wanting to help me.

Not long ago I began to reconnect with my other aunt & uncle on my dad's
side who live in Texas.  We write on ocassion.

As far as my pen-pals go, most of them are people from my parent's church.
Some I have been corresponding with for almost 9 years (and we're still
good friends even though my parents moved to Indiana a few years ago).
Now that my parents live in Goshen, IN, I now have newer pen-pals from
that area.  And some of my parent's friends are interested in helping
me.  Of course there is my girlfriend (though we're not going out).  We
have known each other over 1½ years and we are the best of friends.  We
have shared things about ourselves that we have not told anyone else,
not even our past spouses.  And she is really looking forward to my
being released, and hopes it is sooner rather than later.  We often talk
on the phone, though she frequently complains that these 20 minute calls
simply are not long enough.

Those who get to know me say I have kind eyes, I'm intelligent, charm-
ing, witty, funny, a good listener, caring, and find me endearing.
Much of my family is elderly and are looking forward to my help when I
get out.  And trust me, they feel I've already spent too much time in
prison and are more than ready and able to support me when I get out.

- **Statistics.**  I believe that one of the things looked for in a Clemency
  Petition is the likeliness of an applicant NOT returning to prison.
  And I'm sure that there is a number of criteria that is looked at in
  making that decision.  However, when it comes to a sex offender it
  seems that there is a lot of misinformation and emotional bias pushed
  by popular television shows and the media which tries to sensationalize
  everything, even the weather, just to get ratings.  I will bring up
  statistics and other information here so you can feel more confident
  that granting a Pardon or Commutation of Sentence here is the right
  thing to do.

The recidivism rates for sexual offenses are said to be between 2.5%
and 5% nationally.  (Patrick A. Langan, Ph, D., Erica Leah Schmitt,
Matthew R. Durose, Bureau of Justice Statistics. November 16, 2003
NJC 198281)

Recidivism Statistics: 41.2% for drug offenders, 33.9% for larcenists,
23.4% for burglars, 22.0% for assaulters, 19.0% for defrauders, and
2.5% for rapists.  (Heroux, P. [2012, January 8]  Sex Offenders: Recid-
ivism, Re-Entry Policy and Facts.  Retrieved from Huffington Post:
https://www.huffingtonpost.com/paul-heroux/sex-offenders-recidivism_
b_976765.html)

Results provide no support for the effectiveness of registration and
community notification laws in reducing sexual offending by: (a)rapists,
(b)cild molesters, (sexual recidivists, or (d)first-time offenders.
Analyses also showed that over 95% of all sexual offense arrests were
committed by first-time sex offenders, casting doubt on the ability of
laws that target repeat offenders to meaningfully reduce sexual offend-
ing.  ("Does A Watched Pot Boil?"  A Time-Series Analysis of New York
State's Sex Offender Registration and Notification Law.  Jeffrey C.
Sandler, Naomi J. Freeman, and Kelly M. Socia - University at Albany)

Timothy L. Peterson    *25*    Clemency Petition

Approximately 90% of all sex offenses are committed by a family member or close acquaintance. (U.S. Department of Justice, Bureau of Statistics, Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics, July 2000, NCJ 182990, Table 4 and Table 6.)

On average sex offenders served 3½ years of their 8-year sentence [and I've served about 3 times that already]. (Bureau of Justice Statistics, Nov. 16, 2003, NCJ 198281.)

"Human beings need to treat other human beings in a more humane way... You don't have to be guilty of a sex offense; you just have to be accused of a sex offense and then you are treated as a monster for the rest of your life." -Rita Wahl of Illinois  (CURE-SORT NEWS, Vol. 30, Issue 3, 3rd Quarter 2021, page 2.)

"We are used to law enforcement, district attorneys, legislators, and even judges making statements that amount to lies.  In an opinion he wrote, a Colorado justice said, 'Study after study has shown that sex offenders have one of the highest likelihoods of reoffending once they are released from custody.'  There is NO **'study after study'** that shows this; every credible study done shows the exact opposite."  This article shows at length the extent that the legal system and media outlets are willing to lie about sex offenders for their personal gain.  ("How Can Media Show Integrity In Reporting About Sexual Crime?" by Sandy Rozek.  NARSOL, The Digest, Vol. 14, Issue 5, Oct/Nov 2021, page 1.)

[Op. Ed.]    "There's a passing scene in Braveheart where one can see some-one fastened to a Pillory, a device in which an offender's head and hands are locked in a wooden frame.  They are left in the public square to en-dure mocking as children hurl food at their head.  This dual punishment and spectacle started more than a thousand years ago in Europe before spreading to the New World.  It lasted well into the nineteenth century before it was deemed too cruel and outlawed.
    "In the twentieth century it has been replaced by the various criminal online registeries—sex offenders, youth offenders, violent offenders, e.g. - living on the new public square, the internet.  For better or worse, the internet and social media have significantly amplified humanity's means of public shaming, taking its victims from the town square to global net-work of connected screens.
    "The internet has simplified and super-charged our ability to publicly shame on a scale never previously imagined.  The result is a steady flow of new names and faces as targets—both high profile and everyday returning citizens—flooding our media feeds and rage cycle.  Some proponents call it justice; others embrace it as a social reckoning, while the politicians hide behind unfounded community safety arguements.  Whatever it's called, this new wave of public shaming is affecting individuals and communities through various forms of psychological turmoil, recent research has found...
    "Experts agree; we should not confuse guilt with shame.  Guilt can be good for us.  It teaches us when we have done something wrong through feel-ings of regret and remorse.  Shame, on the other hand, is pointless, causing mostly feelings of uselessness and self-judgement which can inevitably lead to more serious mental issues.  More simply, it is equivalent of you DID something bad verus you ARE bad.  It is hard enough to imagine a scenario

Timothy L. Peterson    *26*    Clemency Petition

when simply making someone feel small and helpless is the morally correct
thing to do.  It sounds more like torture or revenge...  ("Insiders: The
Modern Day Pillary" by Leo.  NARSOL, The Digest, Volume 14, Issue 5, Oct/
Nov 2021, page 6.)

RECIDIVISM OF PAROLED SEX OFFENDERS - TEN(10) YEAR STUDY
· Sex Offender Parolees who were returned to CDCR Custody as a result of a
  New Sex Offense Conviction = 3.38%
· Sex Offender Parolees who were returned to CDCR Custody as a result of a
  New Conviction Other Than A Sex Offense = 3.83%
· Sex Offender Parolees who were returned to CDCR Custody as a result of a
  Violation Of Parole Conditions = 49.06% [lower than average rate]
(California Sex Offender Management Board, www.CASOMB.org, June 2008.)

US DEPT. OF JUSTICE RELEASES RECIDIVISM OF SEX OFFENDER STUDY
Here are some findings in the report:
· The median sentence length among prisoners released in 30 states in 2005
  after serving time for rape or sexual assault (60 months) was longer
  than the median sentence length among all prisoners (36 months).
· Sex offenders were less likely than other released prisoners to be arrest-
  ed during the 9 years following release.
· The longer sex offenders went without being arrested after release, the
  less likely they were to be arrested during the 9-year follow-up period.
· The majority of arrests for a specific type of crime did not involve
  those who had been in prison for the same type of offense.
· At the end of the 9-year follow-up period, male sex offenders had a low-
  er cumulative arrest percentage than all male prisoners.
("Recidivism Of Sex Offenders Released From State Prison: A 9-Year Follow-
Up (2005-14)" by the US Dept. of Justice Bureau of Justice Statistics,
first appeared on Florida Action Committee.)

## 6. Type Of Relief Requested: Full Pardon or Commutation Of Sentence

I would really prefer a **Full Pardon,** not because I feel that I deserve one, but
because of the onerous burdens imposed on a sex offender as part of the condi-
tions of the Registry and Mandatory Supervised Release [MSR].  That said, I
would not turn down any **Commutation of Sentence** regardless of what form it takes.

My parents really could use my help, especially since they are in their 70's
and have a number of health conditions.  However, they live in Indiana, which
will not take a sex offender from another state as long as they are on Parole/
MSR.  And their rules on the Registry would make it difficult for my parents
to see their grandkids if I were to stay with them.  Though otherwise, my
parent's church would also try to help me get back on my feet.

Then there is Nancy & Norm Wetterau, my Dad's relatives who live here in
Illinois.  They really want to help me out upon my release in getting re-
started in life, but in their researching the demands of MSR and the Registry,
they found the rules very prohibitive.  They would be forced to choose between
helping me or being able to see their grandkids.  As of my writing this, I'm
still waiting to hear back as to what they can offer.  A **Full Pardon** would
solve these MSR and Registry related problems.  And due to the very low rate
of recidivism, I would likely be one of your success stories of someone given
a second chance at life.

Timothy L. Peterson    *27*    Clemency Petition

So after serving over eleven(11) years in the Illinois Department of Correc-
tions, and in light of my transformation while in prison, release is appropri-
ate.  For the reasons detailed above, I respectfully request the Governor
grant a FULL PARDON or COMMUTE MY SENTENCE.

### 7. Parole Plan

PLAN A

Plan A would require a **Full Pardon** in order for it to work.  This is because
I would move to **Indiana** to be closer to my aging parents who live in Goshen,
IN.  However, Indiana prohibits sex offenders from entering their State while
on Parole/MSR.  In addition, a **Full Pardon** would make it much easier for me
to get re-established since I'm having to start over from scratch.  The basic
plan is to move-in with my parents until I could find more suitable housing.
As seen in some of the Letters of Support (Goshen, IN area) a number of peo-
ple in my parent's church have expressed a desire to help.  My dad would be
happy to help me find gainful employment, and has several ideas in mind.  Also,
I can go to BarNoneJobs.com and find job-listings for places that hire ex-
felons.  My father would also be happy to help me earn my Driver's License
again.  Plus there are a number of organizations and resources available in
the area to help those recently released from prison get re-established.
Also, Goshen has a good Public Transportation system so I could get to work
and shop for necessities.  As far as my medical needs go, I have diabetes,
an enlarged prostate, and asthma which are easily maintained with medication
prescribed by a doctor and are fairly inexpensive.  Through HealthCare.gov,
I should be uble to sign-up for a plan and find a doctor in the area.  My
parents have also been holding on to $500 for me as seed money, and are will-
ing to be financially responsible for me until I get back on my feet.  While
living with my parents, I would have my own bedroom, and could quarantine in
there if needed.  My parent's address is as follows:

Timothy & Doreen Peterson
16664 Stoney Lane Drive
Goshen, IN 46528

PLAN B, C, etc.

If my sentence was only **commuted**, I would likely have to remain in the State
of Illinois.  Even then, all is not lost.  The husband of my dad's cousin is
wanting to help and can be reached at:

Norman Wetterau, MD
114 Windsor Park Drive, B105
Carol Stream, IL 60188
(585) 705 - 8811
normwetterau@aol.com

Norm is willing to help provide some support along with my father.  However,
I will be unable to stay with them in their Senior Community.  As fas as
healthcare goes, HealthCare.gov can help me, as BarNoneJobs.com can help with
finding employment.  As mentioned before, I also have $500 of my own money to
help me with getting started.  My Birth Certificate and Social Security Card
are currently on file with IDOC.  My dad can help me with getting my Driver's
License again, and a number of these communities have Public Transportation.
The following is a list of places that either have Housing for sex offenders,
offers resources, and/or has sex offender counseling:

Timothy L. Peterson    *28*    Clemency Petition

Joy Care Center Inc.
Aftercare for Ex-Offenders
510 E. Washington St, Suite 112
Bloomington, IL 61701
(309) 827 - 7919
[Helps with employment, housing, transportation, recovery, etc.  Sex
offenders are not excluded]

Future Foundations Org.
(773) 392 - 5907
[Has free and paid housing options - like New Beginnings]

New Day Apartments LLC
25 Telser Rd, #56
Lake Zurich, IL 60047
(847) 628 - 7999
**www.newdayapartments.com**
[Specialize in being 730 ILCS 150 complient.  Currently offers affordable
housing in Kane, Lake, and Will counties.  Need a co-signer and out-date
to be near.]

Precious Blood Ministry of Reconciliation
5114 S. Elizabeth
Chicago, IL 60609
(773) 952 - 6643
Director: Orlando Mayorca
[Housing limited, but can help people find housing.]

Wayside Cross Ministries
215 E. New York St
Aurora, IL 60505
(630) 892 - 4239
Director: Jon Beall (Need Court order and phone interview.)

New Beginnings Recovery Homes Inc.
644 E. 79th St.
Chicago, IL 60619
(773) 707 - 3120
Director: Joseph Williams, CEO
[Housing/Recovery/Treatment - Sex offender OK.]

Beal Properties
2320 N. Damen Ave.
Chicago, IL 60647
**www.bealproperties.com**

G&G Associates
1255 Division St.
Chicago Heights, IL
(773) 737 - 9699
[Has housing in Chicago and Evanston.]

As you can see, there are a number of resources out there that can help with
various needs as I try to start again.  I have always worked my whole life,
and do not have a past history of drug-dealing or gangs as a temptation.  My
chances of recidivism is very low.  Please grant my a Full Pardon or Commuta-
tion of Sentence in the name of justice, and know I won't return to prison.

Timothy L. Peterson    *93*    Clemency Petition

I, Timothy L. Peterson, declare under penalty of perjury that all of the
assertions made in this petition are complete, truthful and accure to the
best of my knowledge.

_Timothy L. Peterson_
Signed

_6 / 23 / 2022_
Date

PETITION FOR
EXECUTIVE CLEMENCY RELIEF: PARDON/COMMUTATION OF SENTENCE
IN THE MATTER OF TIMOTHY L. PETERSON

PROOF OF MAILING/SERVICE

TO: LaSalle County Chief Judge's Office
    119 West Madison Street
    Ottawa, IL 61350

TO: Todd L. Martin
    LaSalle County State's Attorney
    707 East Etna Road
    Ottawa, IL 61350

TO: Illinois Prisoner Review Board
    319 East Madison
    Suite A
    Springfield, IL 62701


    PLEASE TAKE NOTICE that on the date below indicated I have mailed a copy
of the enclosed EXECUTIVE CLEMENCY RELIEF: PARDON/COMMUTATION OF SENTENCE to
the Illinois Prisoner Review Board for filing and consideration in the above
captioned cause.


DATED: 6 / 23 /2022


                              Submitted by,


                        /S/ _Timothy /L. Peterson/_____
                            Timothy L. Peterson  #M22384
                            Shawnee Correctional Center
                            6665 State Route 146 East
                            Vienna, IL 62995

TIMOTHY PETERSON M22384
TAYLORVILLE CORR. CNTR.
1144 ILLINOIS 29
TAYLORVILLE, IL 62568



11/10/2025-25

RECEIVED

NOV 10 2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT



**USPS GROUND ADVANTAGE™**

Correspondence from an inmate at IDOC
Taylorville Correctional Center
1144 Ill Route 29
Taylorville IL 62568-7879

US DISTRICT COURT
NORTHERN DISTRICT
219 S DEARBORN ST
CHICAGO IL 60604-1702

USPS TRACKING #

9434 6401 0962 8002 2063 49

US POSTAGE
PAID
11/03/2025
From 62568
Cube: 10
Zone 3
NO SURCHARGE

Pitney Bowes
CommPrice
2000235791

028WW002312050

C005

0001

LEGAL MAIL